Carole **LEWIS**, et al., Respondents,

v.

The **EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES**, petitioner, Appellant.

No. C8–84–1065.

Supreme Court of Minnesota.

July 3, 1986.

John R. Kenefick, Kevin A. Berg, St. Paul, Robert M. Wattson, Scott M. Jefferson, Andrew W. Horstman, Minneapolis, for appellant.

James W. Kenney, Timothy R. Murphy, St. Paul, for respondents.

AMDAHL, Chief Justice.

Plaintiffs, Carole Lewis, Mary Smith, Michelle Rafferty, and Suzanne Loizeaux, former employees of defendant, the Equitable Life Assurance Society of the United States (company), all hired for indefinite, at-will terms, were discharged for the stated reason of "gross insubordination." They claim that they were discharged in breach of their employment contracts, as determined by an employee handbook, and that they were defamed because the company knew that they would have to repeat the reason for their discharges to prospective employers. A Ramsey county jury awarded plaintiffs compensatory and punitive damages. The Minnesota Court of Appeals affirmed the award but remanded on the issue of contract damages for future harm. We affirm in full the award of compensatory damages but reverse the award of punitive damages.

In spring 1980, the company hired plaintiffs as dental claim approvers in its St. Paul office. During the application pro-

cess, a manager or supervisor of the company interviewed plaintiffs and assured them that if hired, their employment would continue as long as their production remained at a satisfactory level. Plaintiffs did not execute written contracts of employment. They were employed for an indefinite time pursuant to oral agreements, and each received a copy of the company's employee handbook. Among other topics, the handbook discussed policies regarding job security, dismissals, and severance pay.[1]

In fall 1980, the company's Pittsburgh office requested assistance from its St. Paul office. Claim approvers from St. Paul were sent to Pittsburgh beginning in September. In October, plaintiffs, who had never traveled on company business before, were among two groups of employees sent to assist the Pittsburgh office for 2-week periods.

At the time plaintiffs departed for Pittsburgh, the company had written policies concerning travel expenses. Guidelines were set forth on the back of company expense report forms and in management manuals, and the company's St. Paul office manager was responsible for instructing prospective travelers regarding the company's policies. Because he was out of the office at the time the first group departed, the office manager delegated the responsibility to his secretary. A supervisor in the St. Paul office was given responsibility for advising the second group. Neither the secretary nor the supervisor had performed such duties prior to instructing plaintiffs. As a result, they did not review available written guidelines, they did not give plaintiffs any written instructions, and they did not tell plaintiffs that expense reports would have to be filed. Plaintiffs were

---

1. With respect to dismissals, the handbook provided:

   Dismissals usually come about because of an individual's indifference to work quality or attendance standards. Except for misconduct serious enough to warrant immediate dismissal, no employee will be discharged without previous warning and a period in which to bring performance up to a satisfactory level. When a dismissal is necessary and the employee has been with [the company] for six months or longer, severance pay may be granted, depending on the reason for the dismissal.

only orally given information on the company's daily allowances for meals and maid tips and they were told to keep receipts for hotel bills and airfare. In addition, each received a $1,400 travel advance which, having no instruction to the contrary, they spent in full.

When plaintiffs returned to St. Paul, each received a personal letter from management commending them on their job performance while in Pittsburgh. Upon their return, and after they had spent their travel advances, they were also informed for the first time that they would have to submit expense reports detailing their daily expenditures while in Pittsburgh. Plaintiffs complied with the company's request and prepared expense reports in which they attempted to reconstruct their expenses. Upon submission, however, they were asked to change the reports with respect to maid tips because the initial instructions had been erroneous. Plaintiffs complied with this second request. However, plaintiffs were yet again told to change their reports to reflect lower overall totals. Apparently, the company sought to recoup from each plaintiff approximately $200.[2]

Not until late November 1980 did plaintiffs receive written guidelines for completing the expense reports. The guidelines differed from the instructions given prior to their departures. At this point, the company asked plaintiffs to make additional changes in their expense reports. Plaintiffs this time refused to make further changes, maintaining that the expenses shown on their original reports had been honestly and reasonably incurred and were

submitted based upon the instructions they had received prior to leaving for Pittsburgh. The company did not dispute the claims that these expenses were honestly incurred.

Nevertheless, in January 1981, plaintiffs each received a letter from the office manager requesting again that they revise their expense reports. The letter set out still another, different set of guidelines to be followed. Additionally, three plaintiffs met individually with a manager from the company's Chicago office. At the meetings they were once again asked to change their expense reports to conform to company policies. They refused and were told that they were being put on probation. They were also warned, for the first time, that termination might be considered. At trial, company managers testified that the "probation" imposed on the three plaintiffs was not given in reference to the company's dismissal policies, but was primarily for the benefit of company management, to provide time to decide whether to terminate plaintiffs.

A week later, the office manager received orders from Chicago to obtain from two of the plaintiffs monies they had agreed to refund to the company and then to fire all four. The office manager called the two to his office and had them refund the money, saying nothing of the fact that they were to be terminated later that day. Late in the afternoon, he called each plaintiff to his office individually and again asked them to change their reports. When they stated that they were standing by their reports, he terminated them for "gross insubordination."[3] Another em-

**2.** Just prior to the expense report controversy it was discovered that another employee in the office had embezzled $10,000 from the company. Although that incident was a criminal act involving more than ten times as much money as was at stake in all plaintiffs' expense reports combined, the company chose not to prosecute the case.

**3.** Plaintiffs were terminated pursuant to the company's human resources manual, which provides in relevant part:

Gross misconduct is a serious violation of accepted standards of behavior. Examples are: assaulting another employee, involvement in drug traffic, theft or destruction of Equitable's or another employee's property, or misusing an I.D. card. Gross misconduct also includes gross insubordination and falsifica-

ployee involved in the expense-account dispute was not terminated because she agreed to change her report and to refund $200 to the company.

Because they were fired for "gross insubordination," plaintiffs received no severance pay. Had they been fired for other reasons they would have been entitled to as much as one month's severance pay.

The company admitted that the production and performance of plaintiffs was at all times satisfactory and even commendable. Company managers acknowledged that plaintiffs should have been given more thorough instructions and that the company's written guidelines should have been reviewed prior to their departures for Pittsburgh. Management also admitted that the problems could have been avoided had plaintiffs been given proper guidelines prior to their departures.

In seeking new employment, plaintiffs were requested by prospective employers to disclose their reasons for leaving the company, and each indicated that she had been "terminated." When plaintiffs received interviews, they were asked to explain their terminations. Each stated that she had been terminated for "gross insubordination" and attempted to explain the situation. The company neither published nor stated to any prospective employer that plaintiffs had been terminated for gross insubordination. Its policy was to give only the dates of employment and the final job title of a former employee unless specifically authorized in writing to release additional information.

Only one plaintiff found employment while being completely forthright with a prospective employer about her termination by the company. A second plaintiff obtained employment after she misrepresented on the application form her reason for leaving the company. She did, however, explain the true reason in her interview. A third plaintiff obtained employment only

tion of any Equitable records including em-

when she left blank the question on the application form requesting her reason for leaving her last employment; the issue never arose in her interview. The fourth plaintiff has been unable to find full-time employment. All plaintiffs testified to suffering emotional and financial hardship as a result of being discharged by the company.

### Breach of Contract Claim

On appeal, the company argues the following concerning plaintiffs' claims for breach of contract: (1) that the employee handbook did not affect the company's contractual relationship with plaintiffs; (2) that even if the handbook were found to contain provisions enforceable in contract, the company did not commit a breach; and (3) that the trial court prejudicially erred in its jury instructions.

1. *Did employee handbook become part of plaintiffs' employment contracts?*

■ It is undisputed that plaintiffs were hired for indefinite terms, had no written employment contracts, and could have left their employment with the company at any time. We have held that, as a general rule, such employment relationships may be terminated by the employer at any time without cause. *Thomsen v. Independent School District No. 91,* 309 Minn. 391, 244 N.W.2d 282 (1976); *Cederstrand v. Lutheran Brotherhood,* 263 Minn. 520, 117 N.W.2d 213 (1962); *Skagerberg v. Blandin Paper Co.,* 197 Minn. 291, 266 N.W. 872 (1936). We have, however, followed the modern trend in recognizing exceptions to employment at will. *See, e.g., Grouse v. Group Health Plan, Inc.,* 306 N.W.2d 114 (Minn.1981); *Bussard v. College of St. Thomas, Inc.,* 294 Minn. 215, 200 N.W.2d 155 (1972). Specifically, we have determined that, under certain circumstances, employee handbook provisions may create

ployment papers.

contractual obligations enforceable against an employer. *Pine River State Bank v. Mettille,* 333 N.W.2d 622 (Minn.1983).

■ In *Pine River,* we held that personnel handbook provisions, if they meet the requirements for formation of a unilateral contract, may become enforceable as part of the employment contract. 333 N.W.2d at 626–27. To create a binding unilateral contract, a promise of employment on particular terms of unspecified duration must be presented in the form of an offer and must be accepted by the employee. *Id.* at 626. The offer must be definite in form and must be communicated to the employee. *Id.* Here, definiteness is the only issue because the company acknowledges that the handbook was distributed and therefore communicated to each plaintiff at or near the time of her employment.

■ Whether a proposal constitutes an offer for a unilateral contract is determined by the outward manifestations of the parties, not by their subjective intentions. *Cederstrand,* 263 Minn. at 532, 117 N.W.2d at 221. The employee handbook sets forth the company's human resources policies. Among its provisions are sections on "Job Security" and "Dismissals." The section on job security appears to be no more than a general statement of policy: "Equitable seeks to ensure the job security of all salaried employees." General statements of policy do not meet the contractual requirements for an offer. *Pine River,* 333 N.W.2d at 626. The language on dismissals, however, is definite: "Except for misconduct serious enough to warrant immediate dismissal, no employee will be discharged without previous warning and a period in which to bring performance up to a satisfactory level."

■ The company argues that the language in its handbook is not definite enough to constitute an offer. We disagree. The language used clearly limits the right to freely dismiss employees and

plainly states that in certain circumstances all employees are entitled to a warning and to a probationary period prior to dismissal. Further, the handbook states that only "serious misconduct" can constitute a ground for immediate dismissal. While the handbook does not contemplate every possible question regarding procedures for employee dismissals, the language is definite enough to permit a jury to conclude that plaintiffs received certain contractual rights. The precise nature of those rights is unclear, but where the terms of a contract are unclear, it is for a jury to determine the intent of the parties. *See Diesel Truck Drivers Training School, Inc. v. Erickson,* 256 N.W.2d 642, 645 (Minn.1977). A jury verdict will not be overturned on appeal unless it is manifestly and palpably contrary to the evidence, *Stuempges v. Parke, Davis & Co.,* 297 N.W.2d 252, 256 (Minn.1980); and is such that no reasonable mind could find as did the jury. *Belden Porter Co. v. Kimball Co.,* 303 Minn. 98, 99, 226 N.W.2d 310, 310 (1975). There is ample evidence here to support the jury's decision.

■ Because plaintiffs received handbooks at the time they began employment, their continued employment until discharged constituted acceptance of the offer of a unilateral contract and provided the necessary consideration for the offer. *Pine River,* 333 N.W.2d at 627. We therefore conclude that the handbook's dismissal provisions were part of plaintiffs' employment contracts.

## 2. *Was there a breach?*

We next consider whether the company breached its employment contracts with plaintiffs. In so doing we need only assess whether the evidence as a whole reasonably supports the jury's verdict. *Lesmeister v. Dilly,* 330 N.W.2d 95, 100 (Minn. 1983). The jury concluded that the company's actions breached its contractual obligations.

■ The company offers three arguments in support of its position that a breach did not occur. First, it argues that the handbook's section on dismissals does not apply in plaintiffs' cases. The company relies on the first sentence of the section: "Dismissals usually come about because of an individual's indifference to work quality or attendance standards." It argues that this language limits application to *attendance* or *performance* problems, neither of which are issues here. There is, however, no explicit statement in the handbook that the section is limited to attendance or performance. The jury could reasonably conclude that the first sentence is an informative statement of fact rather than a limitation on the dismissal policy. This conclusion is supported by other language referring directly to the company's policy on "serious misconduct," which indicates that the scope of the section includes more than just problems of attendance or productivity.

Contractual terms are ambiguous if they are reasonably susceptible to more than one construction. *Telex Corp. v. Data Products Corp.*, 271 Minn. 288, 291, 135 N.W.2d 681 685 (1965). Where ambiguity exists, and construction depends upon extrinsic evidence, the proper construction is a question of fact for the jury. *Turner v. Alpha Phi Sorority House*, 276 N.W.2d 63, 66 (Minn.1979). The issue whether the handbook provisions created a binding employment contract was fully litigated. The jury finding that the dismissal section applied to plaintiffs is supported by the evidence.

■ The company argues, secondly, that even if the dismissal section did apply to plaintiffs, it did not prohibit the company from terminating plaintiffs without cause but only required that the company provide warnings to plaintiffs. The jury could have reasonably concluded that, read as a whole, the dismissal provisions limited the company's rights to terminate at-will employees. In addition to a warning, the sec-

tion provides for "a period in which to bring performance up to a satisfactory level." According to the provisions, no employee can be discharged without such a probationary period, except in cases of serious misconduct. Because the purpose of this period is to give the employee an opportunity to change his or her performance, the jury could have reasonably drawn the conclusion that the company's employees would be dismissed only for failing to adequately improve their performance or, in other words, for cause.

■ Finally, the company argues that even if the dismissal provisions fully apply, it committed no breach because it complied with the requirements of the provisions. It contends that the meetings held by management with each plaintiff from November 1980 through January 1981 served as warnings. It further argues that the fact plaintiffs were placed on probation a week prior to their terminations and were warned that discharge would be considered indicates full compliance with the handbook. The record, however, reveals clearly that the purpose of the meetings between management and plaintiffs was not to warn them about their "insubordination." The purpose of the meetings was to discuss the types of changes the company wanted made in the expense reports. The reason that there were numerous meetings over a 2- to 3-month period was because the company continually changed its position about what it wanted included in the expense reports. Also, prior to actually being placed on probation, plaintiffs were never told that they might be discharged. Finally, the record reveals that the "probations" given to plaintiffs prior to their dismissals were for the benefit of company management, to provide time to decide whether to terminate plaintiffs. On these facts, the jury could have found noncompliance with the dismissal provisions and breach of plaintiffs' employment agreements.

### 3. *Jury Instructions*

■ Regarding the breach of contract claim, the company lastly asserts that the

jury's verdict was prejudicially affected by erroneous instructions from the trial court. The company argues that the instructions misled the jury and compelled it to find that if a contract was proven the company had forfeited its right to freely terminate employees. The jury was instructed that the handbook provisions could become part of the employment contract only if the company "intended to give up its right to terminate the employment of its employees at will." The instructions are not a model of clarity. However, they must be reviewed as a whole, not as isolated statements taken out of context. *Peterson v. Sorlien,* 299 N.W.2d 123, 130 (Minn.1980). When considered as a whole, the instructions were not clearly erroneous or prejudicial. The cited instructions were given in the context of numerous other instructions that adequately and correctly dealt with nonperformance and breach of contract. The jurors were not compelled to find either that a contract had been formed or that the company had given up its right to terminate its employees at will.

The company asserts that the trial court misstated in its instructions the law with respect to covenants of good faith and fair dealing in employment contracts. The instructions stated: "In considering the terms of plaintiffs' employment agreements with [the company], you are also instructed that in all employment agreements the employer has a duty to exercise good faith and fair dealing in all relations with the employee." We have never decided whether such a condition of good faith is read into employment contracts. *Wild v. Rarig,* 302 Minn. 419, 441, 234 N.W.2d 775, 790 (1975).

■■■■ The court of appeals refused to address this error in the jury instructions because no objection was made during trial. *Lewis v. Equitable Life Assurance Society of the United States,* 361 N.W.2d 875, 880 (Minn.App.1985). Objection, however, was made in the company's motion for a new trial. The court of appeals relied on our holding in *Colby v. Gibbons,* 276 N.W.2d 170, 178 (Minn.1979), that objections to jury instructions not made prior to jury sequestration could not be heard on review. *Colby,* however, involved objections to the wording of instructions. The objection that the company raises here involves a potentially fundamental error of law. Fundamental errors of law in jury instructions are reviewable on appeal so long as they have been assigned as errors in the motion for new trial. Minn.R.Civ.P. 51; *Gryc v. Dayton-Hudson Corp.,* 297 N.W.2d 727, 738–39 (Minn.1980). The company has met this requirement.

■■■■ Although the error the company assigns to the jury instructions is reviewable on appeal, reversal is not required unless the error in the instructions was prejudicial to the company. *See McDonough v. Brite Lite Electric Co.,* 304 N.W.2d 28, 29 (Minn.1981). We conclude that the error in the instructions was not prejudicial. The erroneous instruction did not change the result against the company. We have already concluded that there was ample evidence to support the jury's findings that the handbook's dismissal provisions became part of plaintiffs' employment contracts and that those contracts were breached. The jury instructions concerning breach of contract did not link the determination of breach to the instruction of the duty to exercise good faith.[4] Moreover, the instructions on awarding damages for breach of contract warned against

---

4. The jury instructions on breach of contract stated:

A breach of contract is simply a nonperformance of any contractual duty of immediate performance. A breach may take place by failure to perform acts promised, by prevention or hindrance, or by repudiation.

A failure without justification to perform all or any part of what is promised in the contract is a breach of that contract, and if there is such a breach, the measure of damages which one party may recover from another for that breach is the amount which will reasonably and fairly compensate the plaintiffs or any of them for the damages which natu-

duplicative awards and essentially instructed the jury that the damages for breach were to be the "out-of-pocket losses" suffered by plaintiffs, including lost wages. There is nothing in the record or in the jury's award of damages on the breach of contract claim that suggests that additional damages were awarded for breach of a duty of good faith. In sum, the instruction on the duty in employment contracts to exercise good faith was erroneous and should not have been given; however, since there was substantial evidence of breach of the employment agreements independent of any breach of a duty of good faith, and since there were no additional damages awarded for the latter type of breach, we can find no prejudice to the company.

### Defamation Claim

With regard to plaintiffs' defamation claims, the company argues that the trial court's conclusion of liability on the part of the company was erroneous because: (1) the only publications of the allegedly defamatory statement were made by plaintiffs; (2) the statement in question was true; and (3) the company was qualifiedly privileged to make the statement.

### 1. Publication

In order for a statement to be considered defamatory, it must be communicated to someone other than the plaintiff, it must be false, and it must tend to harm the plaintiff's reputation and to lower him or her in the estimation of the community. *Stuempges*, 297 N.W.2d at 255. Generally, there is no publication where a defendant communicates a statement directly to a plaintiff, who then communicates it to a third person. Restatement (Second) of

Torts § 577, comment m (1977). Company management told plaintiffs that they had engaged in gross insubordination, for which they were being discharged. This allegedly defamatory statement was communicated to prospective employers of each plaintiff. The company, however, never communicated the statement. Plaintiffs themselves informed prospective employers that they had been terminated for gross insubordination. They did so because prospective employers inquired why they had left their previous employment. The question raised is whether a defendant can ever be held liable for defamation when the statement in question was published to a third person only by the plaintiff.

We have not previously been presented with the question of defamation by means of "self-publication." Courts that have considered the question, however, have recognized a narrow exception to the general rule that communication of a defamatory statement to a third person by the person defamed is not actionable. *See, e.g., McKinney v. County of Santa Clara*, 110 Cal.App.3d 787, 168 Cal.Rptr. 89 (1980); *Colonial Stores, Inc. v. Barrett*, 73 Ga. App. 839, 38 S.E.2d 306 (1946); *Belcher v. Little*, 315 N.W.2d 734 (Iowa 1982); *Grist v. Upjohn Co.*, 16 Mich.App. 452, 168 N.W.2d 389 (1969); *Bretz v. Mayer*, 1 Ohio Misc. 59, 203 N.E.2d 665 (1963); *First State Bank of Corpus Christi v. Ake*, 606 S.W.2d 696 (Tex.Civ.App.1980). These courts have recognized that if a defamed person was in some way compelled to communicate the defamatory statement to a third person, and if it was foreseeable to the defendant that the defamed person would be so compelled, then the defendant could be held liable for the defamation.

Several courts have specifically recognized this exception for compelled self-pub-

rally and proximately resulted from the breach.

In order for each of the plaintiffs to recover in this lawsuit on a breach of contract theory, each of them must establish by a fair preponderance of the evidence, first, that there was a contract between her and the defendant; sec-

ond, that there was a failure on the part of the defendant to perform all or some part of what was promised in the contract—in other words, that the contract was breached—and, third, each must prove the amount and extent of her damage.

lication in the context of employment discharges. In an early Georgia case an appellate court was presented with an employee discharged for alleged improper conduct toward fellow employees. *Colonial Stores, Inc. v. Barrett, supra.* At that time, the War Manpower Commission required persons seeking employment to present a certificate of availability to prospective employers. The defendant employer who discharged the employee had written the reason for discharge on the employee's certificate of availability. The employee brought suit for defamation. The court, in affirming the trial court verdict in favor of the plaintiff, held that there "may be a publication when the sender intends or has reason to suppose that the communication will reach third persons, which happens, or which result naturally flows from the sending." 73 Ga.App. at 840, 38 S.E.2d at 307 (quoting 36 Corpus Juris § 172).

In a Michigan case, the plaintiff employee was discharged and subsequently brought a slander action against her former employer. *Grist v. Upjohn Co., supra.* She alleged that the defendant had given her false and defamatory reasons for her discharge and that she was forced to repeat the reasons to prospective employers in detailing her previous employment. The trial court instructed the jury that they could find a slanderous statement even though the statements by the defendant were made only to the plaintiff. Affirming the trial court's jury instruction, the Michigan appellate court held: "Where the conditions are such that the utterer of the defamatory matter intends or has reason to suppose that in the ordinary course of events the matter will come to the knowledge of some third person, a publication may be effected." 16 Mich.App. at 485, 168 N.W.2d at 406.

Most recently, a California court considered the question of compelled self-publication in the employment discharge context. *McKinney v. County of Santa Clara, supra.* A discharged deputy sheriff brought a claim of defamation against his former employer. The California appellate court recognized that liability for defamation may arise "where the originator of the defamatory statement has reason to believe that the person defamed will be under a strong compulsion to disclose the contents of the defamatory statement to a third person *after* he has read it or been informed of its contents." 110 Cal.App.3d at 796, 168 Cal.Rptr. at 93–94 (emphasis in original). The court's rationale for imposing liability on a defendant for the foreseeable republication by a plaintiff of a defamatory statement was based upon the "strong causal link" between the defendant's actions and the damage caused by the republication. The court reasoned:

> This causal link is no less strong where the foreseeable republication is made by the person defamed operating under a strong compulsion to republish the defamatory statement and the circumstances which create the strong compulsion are known to the originator of the defamatory statement at the time he communicates it to the person defamed.

*Id.* at 798–99, 168 Cal.Rptr. at 94.

The company presents two arguments against recognition of the doctrine of compelled self-publication. It argues that such recognition amounts to creating tort liability for wrongful discharge which, it asserts, has been rejected by this court. In *Wild v. Rarig,* 302 Minn. at 442, 234 N.W.2d at 790, we held that bad-faith termination of contract is not an independent tort of the kind that will permit a tort recovery. The company, however, misreads our holding regarding tort liability for wrongful discharge. We did not hold that the harm resulting from a bad-faith termination of a contract could never give rise to a tort recovery. Indeed, we recognized such a possibility by stating that a plaintiff is limited to contract damages "except in exceptional cases where the defendant's breach of contract constitutes or is

accompanied by an independent tort." *Id.* at 440, 234 N.W.2d at 789. If plaintiffs here can establish a cause of action for defamation, the fact that the defamation occurred in the context of employment discharge should not defeat recovery.

The company also argues that recognition of the doctrine of self-publication would discourage plaintiffs from mitigating damages. This concern does not appear to be a problem, however, if liability for self-publication of defamatory statements is imposed *only* where the plaintiff was in some significant way compelled to repeat the defamatory statement and such compulsion was, or should have been, foreseeable to the defendant. Also, the duty to mitigate can be further protected by requiring plaintiffs when they encounter a situation in which they are compelled to repeat a defamatory statement to take all reasonable steps to attempt to explain the true nature of the situation and to contradict the defamatory statement. In such circumstances, there would be no voluntary act on the part of a plaintiff that would constitute a failure to mitigate. This point is clearly illustrated by the present action. The company points to no reasonable course of conduct that plaintiffs could have taken to mitigate their damages.

The trend of modern authority persuades us that Minnesota law should recognize the doctrine of compelled self-publication. We acknowledge that recognition of this doctrine provides a significant new basis for maintaining a cause of action for defamation and, as such, it should be cautiously applied. However, when properly applied, it need not substantially broaden the scope of liability for defamation. The concept of compelled self-publication does no more than hold the originator of the defamatory statement liable for damages caused by the statement where the originator knows, or should know, of circumstances whereby the defamed person has no reasonable means of avoiding publication of the statement or avoiding the resulting damages; in other words, in cases where the defamed person was compelled to publish the statement. In such circumstances, the damages are fairly viewed as the direct result of the originator's actions.

Properly applied, the doctrine of compelled self-publication does not unduly burden the free communication of views or unreasonably broaden the scope of defamation liability. Accordingly, we hold that in an action for defamation, the publication requirement may be satisfied where the plaintiff was compelled to publish a defamatory statement to a third person if it was foreseeable to the defendant that the plaintiff would be so compelled.

In the present action, the record indicates that plaintiffs were compelled to repeat the allegedly defamatory statement to prospective employers and that the company knew plaintiffs would be so compelled. The St. Paul office manager admitted that it was foreseeable that plaintiffs would be asked by prospective employers to identify the reason that they were discharged. Their only choice would be to tell them "gross insubordination" or to lie. Fabrication, however, is an unacceptable alternative.

### 2. *Issue of Truth*

Finding that there was a publication, we next turn to the issue of truth. True statements, however disparaging, are not actionable. *Stuempges,* 297 N.W.2d at 255. Since it is true that plaintiffs were fired for gross insubordination, the company argues, they cannot maintain an action for defamation. The company contends the relevant statement to consider when analyzing the defense of truth is the one that plaintiffs made to their prospective employers, that is, that they had been fired for gross insubordination. Plaintiffs counter that it is the truth or falsity of the underlying statement—that plaintiffs engaged in gross insubordination—that is relevant.

The company relies for its authority solely upon language of this court in *Johnson v. Dirkswager,* 315 N.W.2d 215, 218–19 (Minn.1982), where we raised the question whether truth as a defense goes to the verbal accuracy of the statement or to the underlying implication of the statement. In *Dirkswager,* however, it was unnecessary to resolve the question. Moreover, that case is distinguishable from the present case because there the underlying statements were presented merely as "allegations of misconduct." *Id.* at 219 n. 4. Here, the company's charges against plaintiffs went beyond accusations and were conclusory statements that plaintiffs had engaged in gross insubordination.

Requiring that truth as a defense go to the underlying implication of the statement, at least where the statement involves more than a simple allegation, appears to be the better view. *See* Restatement (Second) of Torts § 581A, comment e (1977). Moreover, the truth or falsity of a statement is inherently within the province of the jury. This court will not overturn a jury finding on the issue of falsity unless the finding is manifestly and palpably contrary to the evidence. Thus, we find no error on this point because the record amply supports the jury verdict that the charge of gross insubordination was false.

### 3. *Qualified Privilege*

Even though an untrue defamatory statement has been published, the originator of the statement will not be held liable if the statement is published under circumstances that make it conditionally privileged and if privilege is not abused. Restatement (Second) of Torts § 593 (1977). The law in Minnesota is:

> [A] communication, to be privileged, must be made upon a proper occasion, from a proper motive, and must be based upon reasonable or probable cause. When so made in good faith, the law does not imply malice from the communi-

cation itself, as in the ordinary case of libel. Actual malice must be proved, before there can be a recovery, and in the absence of such proof the plaintiff cannot recover.

*Stuempges,* 297 N.W.2d at 256–57 (quoting *Hebner v. Great Northern Railway,* 78 Minn. 289, 292, 80 N.W. 1128, 1129 (1899)).

The doctrine of privileged communication rests upon public policy considerations. As other jurisdictions recognize, the existence of a privilege results from the court's determination that statements made in particular contexts or on certain occasions should be encouraged despite the risk that the statements might be defamatory. *See Calero v. Del Chemical Corp.,* 68 Wis.2d 487, 498, 228 N.W.2d 737, 744 (1975). Whether an occasion is a proper one upon which to recognize a privilege is a question of law for the court to determine. *Jacron Sales Co. v. Sindorf,* 276 Md. 580, 350 A.2d 688 (1976); *Fisher v. Myers,* 339 Mo. 1196, 100 S.W.2d 551 (1936); *Cash v. Empire Gas Corp.,* 547 S.W.2d 830, 833 (Mo.Ct.App. 1976). In the context of employment recommendations, the law generally recognizes a qualified privilege between former and prospective employers as long as the statements are made in good faith and for a legitimate purpose. *Stuempges,* 297 N.W.2d at 257.

Plaintiffs argue that a self-publication case does not properly fit within the qualified privilege doctrine. Two of the cases which plaintiffs cite in support of the self-publication doctrine, however, appear to agree that the employer's qualified privilege does apply. *See Colonial Stores, Inc. v. Barrett,* 73 Ga.App. 839, 38 S.E.2d 306; *Grist v. Upjohn Co.,* 16 Mich.App. 452, 168 N.W.2d 389. Also, the logic of imposing liability upon a former employer in a self-publication case appears to compel recognition of a qualified privilege. A former employer in a compelled self-publication case may be held liable as if it had actually published the defamatory statement directly to prospective employers. Where an em-

ployer would be entitled to a privilege if it had actually published the statement, it makes little sense to deny the privilege where the identical communication is made to identical third parties with the only difference being the mode of publication. Finally, recognition of a qualified privilege seems to be the only effective means of addressing the concern that every time an employer states the reason for discharging an employee it will subject itself to potential liability for defamation. *Stuempges*, 297 N.W.2d at 257. It is in the public interest that information regarding an employee's discharge be readily available to the discharged employee and to prospective employers, and we are concerned that, unless a significant privilege is recognized by the courts, employers will decline to inform employees of reasons for discharges. *Id.* We conclude that an employer's communication to an employee of the reason for discharge may present a proper occasion upon which to recognize a qualified privilege.

■■■ This conclusion does not necessarily determine that the company's statements were privileged. A qualified privilege may be lost if it is abused. The burden is on the plaintiff to show that the privilege has been abused. *Id.* While the initial determination of whether a communication is privileged is a question of law for the court to decide, the question of whether the privilege was abused is a jury question. Restatement (Second) of Torts, § 619 (1977). The company argues that the trial court in its instructions improperly submitted *both* questions to the jury and misconstrued the nature of the qualified privilege. The challenged instruction stated:

> The burden of establishing that it was entitled to such a qualified privilege, of

course, is on the defendant [company]. In determining whether [the company] was entitled to the qualified privilege, you should ask yourselves whether agents of [the company] had reasonable grounds to believe that the various plaintiffs had displayed gross insubordination in light of all the circumstances known to the agents of [the company] at the time and whether the agent or agents believed that the statements were made in good faith.

The court should not have submitted the issue of the company's entitlement to the qualified privilege to the jury. Absent abuse, the company was entitled to the privilege.

■■■ This error, however, was not prejudicial because the jury found that the company's statements were "actuated by actual malice." A qualified privilege is abused and therefore lost if the plaintiff demonstrates that the defendant acted with actual malice. *Stuempges*, 297 N.W.2d at 257. The jury instructions correctly placed the burden of demonstrating malice on the plaintiff. Most importantly, the jury's special verdict finding on actual malice did not depend upon a finding that there was a qualified privilege.[5] Even though the jury was not properly instructed on the qualified privilege, it nevertheless found the actual malice which negates the company's entitlement to the privilege. Thus, the company was not prejudiced.

■■■ The company also argues that the court's instructions incorrectly stated the standard of malice which plaintiffs must prove if the existence of a qualified privilege is demonstrated. The law recognizes essentially two definitions of malice in defamation cases: the "actual malice" definition as set forth in *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct.

---

**5.** The special verdict form submitted to the jury stated in relevant part:

17) Did [the company] have a qualified privilege to have the words "gross insubordination" communicated to prospective employers of the

plaintiffs? (Yes or No)      NO

18) Was the use of the words "gross insubordination" actuated by actual malice? (Yes or No)      YES

710, 726, 11 L.Ed.2d 686 (1964), and the common-law definition. *See Stuempges,* 297 N.W.2d at 257. The common-law definition is more appropriate in the employer-employee situation because it focuses on the employer's attitude toward the plaintiff. *See id.* at 258. Under the common-law definition, malice exists where the defendant " 'made the statement from ill will and improper motives, or causelessly and wantonly for the purpose of injuring the plaintiff.' " *Id.* at 257 (quoting *McKenzie v. William J. Burns International Detective Agency, Inc.,* 149 Minn. 311, 312, 183 N.W. 516, 517 (1921)). In its instructions, the court informed the jurors that if they found that the company was entitled to a qualified privilege, plaintiff had to prove that the statement was made "with actual malice." In defining malice for the jury, the court correctly set forth the common-law definition. We therefore find no error in the jury instructions.

### Damages

#### 1. Compensatory Damages

After finding the company liable on the breach of contract and defamation claims, the jury awarded plaintiffs compensatory and punitive damages. The trial court instructed the jury that in determining compensatory damages on the breach of contract claim, the jury could consider harm to the "future earning capacity" of each plaintiff. After trial, the court suggested and approved dismissal of claims plaintiffs had pleaded for expungement of the defamatory words from the company's records. The court observed that the verdict itself vindicated plaintiffs so that injunctive relief was unnecessary. The court, however, did not modify the award to eliminate damages for future harm.

The court of appeals remanded the issue of compensatory damages to the trial court to eliminate any awards for future harm, concluding that the awards must "exclude losses which are avoided by publi-

cation of the verdict, or can be avoided by expungement of defamatory statements * * *." *Lewis v. Equitable Life Assurance Society,* 361 N.W.2d at 883. A jury award will not be set aside unless it is manifestly and palpably contrary to the evidence. *Levienn v. Metropolitan Transit Commission,* 297 N.W.2d 272, 273 (Minn.1980); *Miller v. Hughes,* 259 Minn. 53, 56, 105 N.W.2d 693, 696 (1960). We determine in this case that it is not necessary to remand the award of compensatory damages. Neither expungement of the company's records nor vindication at trial eliminate all future harm to the plaintiffs' earning capacity. The fact that plaintiffs brought suit against the company may itself have future detrimental effects. A person who brings suit against a former employer is likely to be a less attractive employment candidate to prospective employers. No amount of vindication with respect to the gross insubordination charge can eliminate this impact on plaintiffs' future work lives. We conclude that there was no error in including damages for future harm in plaintiffs' awards. The trial court awards of compensatory damages are supported by the evidence, and we therefore reverse the court of appeals directive remanding the issue of compensatory damages.

#### 2. Punitive Damages

We also reverse the award of punitive damages on the defamation claim. Although Minnesota law recognizes that punitive damages may be imposed in certain actions, *see* Minn.Stat. § 549.20 (1984), the instant suit is not an appropriate action in which to do so. The concern of the legislature in enacting the punitive damages statute, section 549.20, was to limit the frequency and amounts of punitive damage awards. *Minnesota-Iowa Television Co. v. Watonwan T.V. Improvement Association,* 294 N.W.2d 297, 311 (Minn.1980). The intent was essentially to codify the existing case law on punitive damages.

Thus, section 549.20 should not be read to extend the availability of punitive damages to newly recognized causes of actions, such as an action based upon compelled self-publication.

The availability of punitive damages in these causes of actions depends upon the evaluation of a variety of policy considerations, including " 'the nature of the conduct in question, the wisdom of some form of pecuniary punishment, and the advisability of a deterrent.' " *Scott v. Plante*, 641 F.2d 117, 135 (3d Cir.1981) (quoting *Fisher v. Volz*, 496 F.2d 333, 347 (3d Cir.1974). Punitive damages are not generally favored by the law. *Sellers v. O'Connell*, 701 F.2d 575, 579 (6th Cir.1983); *Scott*, 641 F.2d at 135; *Cochetti v. Desmond*, 572 F.2d 102, 105 (3d Cir.1978); *Simpson v. Weeks*, 570 F.2d 240, 243 (8th Cir.1978); *Knippen v. Ford Motor Co.*, 546 F.2d 993, 1002 (D.C. Cir.1976); *Lee v. Southern Home Sites Corp.*, 429 F.2d 290, 294 (5th Cir.1970). They are only to be allowed with caution and within narrow limits. *Fountila v. Carter*, 571 F.2d 487, 491 (9th Cir.1978); *Simpson*, 570 F.2d at 243; *Southern Home Sites*, 429 F.2d at 294. " '[T]he very power of the remedy demands that judges exercise close control over the imposition and assessment of punitive damages.' " *Eisert v. Greenberg Roofing & Sheet Metal Co.*, 314 N.W.2d 226, 229 (Minn.1982) (quoting Mallor & Roberts, *Punitive Damages: Toward a Principled Approach*, 31 Hastings L.J. 639, 670 (1980)); *see also Lundgren v. Eustermann*, 370 N.W.2d 877, 882 (Minn.1985).

■ Applying these principles, we deny the imposition of punitive damages in defamation actions involving compelled self-publication. We are concerned that the availability of punitive damages may tend to encourage publication of defamatory statements in actions where the plaintiff, rather than the defendant, does the actual publication. More importantly, in the context of an employee discharge, the availability of punitive damages in such an action may significantly deter employer communication of the reason for discharge. "When punitive damages are injected into a case, the defendant's reputation as well as its money become involved, and the litigation can assume a different dimension." *Lundgren*, 370 N.W.2d at 882. When an employer's reputation and its liability for potentially large money damages are at stake, the employer may be unwilling to trust its fate to a jury. Even with the qualified privilege, the risk of punitive damages may prove too great. As a result, the employer may refuse to state a reason when discharging an employee. As indicated above, such a result would not serve the interests of the public.

In determining the availability of punitive damages, we must consider the interests of society as well as those of the plaintiff. We find that punitive damages in a compelled self-publication case are not advisable as a deterrent. Accordingly, we hold that punitive damages are not available in defamation actions based upon compelled self-publication, and therefore the award of punitive damages to plaintiffs is reversed.

Affirmed in part; reversed in part.

SIMONETT, Justice (dissenting in part and concurring in part).

In its handbook, Equitable reserved its right as an at-will employer to dismiss an employee for serious misconduct, but it agreed it would not dismiss for other misconduct or poor performance without a prior warning and an opportunity afforded to the employee to bring his or her performance up to a satisfactory level.

In this case we have an unusual situation. This was not a case where the employee could be warned about her performance and told not to do it again. The situation was unlikely to re-occur. If plaintiffs were asked to travel again with adequate instructions about use of their expense advances, they would presumably

have abided by their instructions. The problem here was the past mistake made by plaintiffs' supervisor and the supervisor's secretary in not giving adequate instructions for the Pittsburgh trip. Plaintiffs insisted the employer should be bound by this mistake and that Equitable, not they, should bear the cost of the mistake. Human nature being what it is, the problem escalated into something more serious, a confrontation in which neither side would yield.

At this point, Equitable discharged the plaintiffs for gross insubordination, *i.e.*, for flagrant unwillingness to submit to authority. Unfortunately for Equitable, the jury found there was no gross insubordination. It does not follow, however, that Equitable breached any contract by discharging plaintiffs on an unproven charge of insubordination. It is undisputed plaintiffs were employees at will except as the employee handbook may have modified this arrangement. Nothing in the handbook says or can be construed to say Equitable had agreed the employees could only be discharged for cause. *See Hunt v. IBM Mid America Employees Federal Credit Union,* 384 N.W.2d 853 (Minn.1986). If plaintiffs have a remedy, it must lie in tort, not contract, unless we are willing to do away with at will employment.

We have no idea how the jury construed the handbook, although, to me, it seems likely the jury was influenced by the trial court's erroneous instruction on "fair dealing," especially on the meaning of the handbook phrase "misconduct serious enough to warrant immediate dismissal." But as Justice Kelley points out in his dissent, the interpretation of the handbook, since it involved no extrinsic evidence, was a question of law for the court to decide. *See Turner v. Alpha Phi Sorority House,* 276 N.W.2d 63, 66 (Minn.1979) ("That the jury resolved the issue does not transform

it into a question of fact"). In my view, the handbook provision was intended by the parties to be part of their employment relationship to the extent stated in the first paragraph of my dissent, but this provision, so understood, was irrelevant to the dispute between the parties and, therefore, there was no contract breach. The handbook provision here is not to be construed as if it were the entire agreement on matters of employee discipline and dismissal (it is not), but as a modification of the parties' at-will contract to the extent expressed.[1]

What we are left with is a common-law defamation action, such as we recognized in *Stuempges v. Park, Davis & Co.,* 297 N.W.2d 252, 255 (Minn.1980), except that here we allow the publication to be satisfied, subject to certain strict safeguards, by "self publication." On this issue, as well as the punitive damages issue, I agree with the majority.

COYNE, Justice (dissenting in part and concurring in part).

I join in Justice Simonett's opinion dissenting in part and concurring in part.

KELLEY, Justice (dissenting):

Even though I concede that it is not difficult to conclude that the terminations of these four employees was done in a shoddy, callous, and perhaps even deceiving manner, I feel constrained to dissent with today's court opinion.

Unless the employee handbook delivered to these four employees modified the relationship between the parties, the employment of the respondents by Equitable was an at-will relationship. In *Pine River State Bank v. Mettille,* 333 N.W.2d 622 (Minn.1983), we specifically held that in order to change an at-will employment contract into a unilateral employment contract

---

1. Apparently the jury, in order to find a contract breach, chose to read the handbook to be the entire agreement on dismissal and, therefore, to say in effect: "No employee will be discharged except as follows: 1) for serious misconduct, immediately; 2) for other conduct, only after a warning and a probationary period." But this is not how the handbook reads.

terminable only for cause, the words used by the employer in an employee handbook must set out in "definite language" an offer for a unilateral contract for procedures to be followed in job discipline and dismissals. *Id.* at 630. However, in *Pine River*, we also noted that general statements of policy do not meet the contractual requirements sufficient to constitute an offer. *Id.* at 626. *See also Degen v. Investors Diversified Services, Inc.*, 260 Minn. 424, 110 N.W.2d 863 (1961).

A comparison of the discipline and dismissal provisions in the *Pine River* employment manual with those contained in Equitable's employment handbook demonstrates that the vague language in the Equitable manual fails to approach the definiteness requirement set forth in *Pine River*. The discipline and dismissal provisions in *Pine River* provided for a definite, explicit, and detailed four-step procedure.

If an employee has violated a company policy, the following procedure will apply:

1. An oral reprimand by the immediate supervisor for the first offense, with a written notice sent to the Executive Vice President.
2. A written reprimand for the second offense.
3. A written reprimand and a meeting with the Executive Vice President and possible suspension from work without pay for five days.
4. Discharge from employment for an employee whose conduct does not improve as a result of the previous action taken.

In no instance will a person be discharged from employment without a review of the facts by the Executive Officer.

333 N.W.2d at 626, n. 3.

In contrast to this precisely delineated termination procedure, the Equitable Employee Manual vaguely asserts: "Except for misconduct serious enough to warrant immediate dismissal, no employee will be discharged without previous warning and a period in which to bring performance up to a satisfactory level." In my opinion, the language in the Equitable handbook amounts to nothing more than a general statement of policy which, as indicated in the majority opinion, is legally insufficient to change an at-will employment relationship to one where discharge may be only for cause. I cannot conclude that the nebulous language in the Equitable Employee Manual "clearly limits the right to freely dismiss employees."

While the majority concedes the company's handbook "does not contemplate every possible question regarding dismissal procedures," the language is "definite enough to permit a jury to conclude that plaintiffs received certain contractual rights." Although admitting the precise "nature of those rights is unclear," the majority opines that it is for the jury to determine the intent of the parties, or, as I understand it, to determine whether the language is sufficiently definite.[1]

In *Pine River* there was no question that the termination and disciplinary proceedings were sufficiently definite so as to constitute an offer. The jury only needed to decide whether the bank intended the handbook to be binding on it, *id.* at 630, n. 6, and, if so, whether it was breached. I suggest that whether the Equitable handbook dismissal language is sufficiently definite to constitute an offer is a question of law for the court, not for the jury which has the duty to decide issues of acceptance, consideration, breach, and, if appropriate, damages. *See, e.g., Hunt v. IBM Mid America Employees Federal Credit Union*, 384 N.W.2d 853, 856 (Minn.1986).

In holding that the jury could have concluded that the discipline and dismissal pro-

---

1. When employees are relying exclusively on language contained in a manual furnished by an employer in attempting to establish a contract providing for disciplinary or termination procedures, as they are here, whether language used in the manual is sufficiently definite to constitute a contractual offer is for the court. *Hunt v. IBM Mid America Employees Federal Credit Union*, 384 N.W.2d 853, 856 (Minn.1986).

visions "read as a whole" limited the company's rights to terminate at-will employees, the majority permits the jury to find that dismissal may be only for cause. The employees handbook issued by Equitable is completely devoid of any reference, directly or indirectly, to "dismissal for cause."

An oft repeated aphorism in the law is that "hard cases make bad law." This is such a case. The conduct of the superiors, arguably prompted in some degree, at least, by the obduracy of the employees in refusing to comply with company expense account reporting policies, was, on the whole, despicable. Fortunately, such egregious conduct by superiors towards employees in these days is rare, but when present it is understandable why juries and judges sometimes are tempted to extend judicial rules to afford those victims vindication and compensation. As much as these results are appealing to one's sense of justice in this case, I fear the consequences of today's decision will allow future juries and courts, after the fact, to strain amorphous, vague language expressing general policy into a definite contract in which the employer is subject to liability unless the employer can prove just cause. I would not go beyond *Pine River.* I would hold that before a unilateral contract can arise providing for due process type discipline and dismissal procedures, the language in the alleged offer, whether contained in an employee manual or other type of communication to the employee, must be sufficiently definite to meet the standard set out in *Pine River* as a matter of law. Further, whether the language is so definite should be a question of law for the court to decide. Otherwise juries and courts will be creating contracts, long after the inception of the employment, containing termination and discipline procedures never objectively contemplated by either party at the time of the institution of the relationship.

I likewise disagree with the majority opinion as it addresses the defamation claims of the respondents. At the time of their discharge, respondents were told by the company that the reason for the discharge was "gross insubordination." Notwithstanding the crudeness with which the supervisory employees handled the situation, still the fact remains that, over the course of three months, respondents intentionally, adamantly, and repeatedly refused to obey numerous company requests to submit revised travel expense reports that complied with previously established company policies for such accounts. Thus, from the standpoint of the company supervisor, that conduct is appropriately categorized as "gross insubordination." Nevertheless, the only communication of that was to the respondents themselves. There was no publication of the reason for the discharge to others by Equitable. Indeed, it was Equitable's policy to not release any information on former employees, other than the dates of employment and the last job title, unless the former employee authorized, in writing, the release of additional information. Moreover, the company did not challenge any of the applications of any of these respondents when they made unemployment compensation claims.

The company neither published nor communicated its reason for termination to any person other than the employees themselves. It is clear that there was publication; but the publication was made by the employees themselves in communications to prospective employers. Generally, such publication amounts to insufficient publication to sustain a defamation claim. *See* Restatement (Second) of Torts § 577(1) (1977). The majority opinion holds that the "self publication" in this case comes under a narrow exception to the general rule that communication of a defamatory statement to a third person by the person defamed is not actionable. Very few courts of this nation have recognized this exception. Those few courts who have recognized it have held that for a defamatory statement to be actionable, the claimant must show more than that the alleged defamer "knew

or should have known" that the utterances and their publication would come to the attention of a third person. *See Belcher v. Little,* 315 N.W.2d 734 (Iowa 1982). In addition, there must exist a strong compulsion upon the defamed person to disclose the defamatory statement to third parties. Likewise, there must be showing that such compulsion was reasonably foreseeable by the wrongdoer at the time the statement was published. *Id.* at 738. What constitutes compulsion must be decided by the finder of fact. *Id.*

In this case, the trial court's instruction on when and under what circumstances the narrow exception of "self publication" applies, even if technically correct, was, at best, confusing. For example, on two separate occasions in the instructions, the trial court generally discussed "self publication" and "compulsion." On both occasions, the instruction was either incomplete or erroneous. In a third instance, in point of time considerably removed from the other two, the court instructed the jury that if it found the defamatory language was "communicated to someone other than the plaintiffs by Equitable Life *or by the plaintiffs, themselves* * * * compensatory damages are presumed." (Emphasis added.) Thus, on that occasion, the jury was reminded neither of "compulsion" nor of the requirement that Equitable should have realized that disclosure would be compelled to third parties.

Recognition of the so-called "doctrine" of "self publication" under circumstances similar to this case discourages plaintiffs from mitigating damages, as pointed out by the dissenter in the court of appeals. *Lewis v. Equitable Life Assurance Society of the United States,* 361 N.W.2d 875, 884 (Minn. Ct.App.1985) (Forsberg, J., dissenting). For example, respondents here originally sought to have "gross insubordination" expunged from their records as part of declaratory relief. Obviously, such an expungement would work against their self interest because, if granted, would mitigate, if not eliminate, the basis of recovery of future damages. Predictably, therefore, respondents chose to dismiss this claim for declaratory relief because expungement would lower, if not eliminate, recovery of future defamation damages.

In my view, the majority opinion gives insufficient attention to the ramifications of the mitigation problem. The opinion asserts the nonexistence of such a problem "if liability * * * is imposed *only* where the plaintiff was in some significant way compelled to repeat the defamatory statement and such compulsion was, or should have been, foreseeable to the defendant." In claims brought by ex-employees against employers for defamation when the employment was terminated for "incompetence," "dishonesty," "insubordination" or for any other reason carrying a connotation of immorality, ineptness, or improbity, "compulsion" will almost automatically be found in connection with future job applications by the discharged employee. Such "compulsion" would, with certainty, be foreseeable by the ex-employer. Moreover, I cannot agree with the assertion in the opinion that: "Properly applied, the doctrine of compelled self-publication does not unduly burden the free communication of views or unreasonably broaden the scope of defamation liability." To the contrary, I suggest that today's ruling substantially expands the scope of the defamation action. Now, the only way an employer can avoid litigation and the possible liability for substantial damages, is to cease communicating the reason it felt justified the termination, not only to third persons, but even to the employee himself or herself.

For these reasons, I would reverse.