LaDonna C. WILSON, Respondent,

v.

**WEIGHT WATCHERS OF UPPER MIDWEST, INC., Appellant.**

No. C8–90–2256.

Court of Appeals of Minnesota.

Aug. 20, 1991.

Review Denied Oct. 16, 1991.

Michael B. Chase, Schway & Chase, St. Paul, for respondent.

Katherine L. MacKinnon, Lindsay G. Arthur, Jr., Arthur, Chapman & McDonough, Minneapolis, for appellant.

Considered and decided by RANDALL, P.J., and HUSPENI and SCHUMACHER, JJ.

## OPINION

RANDALL, Judge.

Weight Watchers of the Upper Midwest, Inc. (Weight Watchers), appeals from the denial of its motion for Judgment Not Withstanding the Verdict (JNOV) following a jury trial for defamation. Appellant argues its statements to respondent should have been insulated from liability by a qualified privilege. Appellant also contends that JNOV should have been entered

in its favor because it was not foreseeable that respondent would be compelled to self-publish the defamatory statements. Because we find appellant was entitled to a qualified privilege as a matter of law, and the record lacks any evidence to support malice, we reverse.

## FACTS

Appellant, Weight Watchers of Upper Midwest, Inc., is a franchise of Weight Watchers International, a subsidiary of Heinz 57. Appellant's central office is located in Minneapolis, and respondent was employed at the central office as a general clerical employee.

Respondent began working for appellant in April 1978. Her duties included answering phone inquiries from Weight Watchers members, purchasing and maintaining inventory of office supplies, minor maintenance of office equipment, maintaining petty cash, office typing, office mail, substitute receptionist and performing tallies (a tally is a log of information from all Weight Watchers meetings showing student attendance, weight loss, dues collected, and this log is used to report to Weight Watchers International). Respondent and Sylvia Knazan were supposed to split the daily tallies performed 50/50. Respondent's desk was in the phone room, and she shared this area with Geraldine Smith and Knazan. The office receptionist was Dorothy Buchite.

Respondent's immediate supervisor was Shirley Bolduc. The remainder of the management team consisted of Ann Davidson, Anne Moen, Connie Stafford, and appellant's president, Jan Schonwetter. Respondent and the management team all worked on the same floor. From 1978 through 1985, there were no written performance appraisals. In September 1985, Bolduc wrote up respondent's first written performance evaluation.

The evaluation contained three suggestions for respondent to improve her productivity: refrain from wandering away from her desk, answer the phones more quickly during lunch and from 4:00—5:00 p.m. (both times are when the receptionist was

away from her desk and respondent was expected to cover for the receptionist), and keep personal tasks to a minimum. Respondent drew a line through the references to wandering and personal tasks before she signed the evaluation. No further comments regarding performance were made to respondent until February 7, 1986.

Sometime prior to February 7th, Bolduc began receiving complaints from co-workers regarding respondent's work performance. In consultation with Davidson, Bolduc began to keep a file on respondent's work deficiencies. Bolduc consolidated her file on respondent with the complaints she had received from co-workers into a memorandum on February 6, 1986, and gave it to Davidson.

On February 7, 1986, respondent was called into a meeting with Davidson, Moen and Stafford. As they walked into the conference room, respondent said "this looks serious" and stated "I wish I had a valium." The February 6, 1986, memo concerning work deficiencies was read to respondent. Respondent contends that Moen then went on to say words to the effect: "You have a problem;" "We don't know [what], but we're going to find out;" "You have a valium problem;" "Do you have an alcohol problem? [We think so] because we smell it on you." In contrast, Moen testified that she didn't say anything about valium, and that she only asked a question about whether respondent had an alcohol problem. Davidson testified that Moen only asked if respondent had an alcohol problem.

Regarding odor, Bolduc claimed she smelled an odor of alcohol on respondent's breath at least once. Davidson testified to smelling an odor on one occasion prior to February 1986. Smith testified that she smelled the odor of alcohol on respondent more than ten times. Buchite also had smelled an odor of alcohol. Respondent contends that during 1986 she was suffering from pyorrhea and was chewing nicotine gum in an effort to quit smoking. Respondent produced a witness at trial to testify that both of these conditions can lead to bad breath.

From February to April 1986, Bolduc continued to maintain a performance file on respondent. In April 1986, Bolduc prepared another memo outlining work deficiencies observed since February and informed respondent she was still not answering phones quickly enough. No mention of alcohol was made in either this memo or during the work evaluation.

Bolduc told respondent's co-workers, Smith and Buchite, to keep lists of respondent's work deficiencies. Smith was asked to track the amount of tallies performed by respondent against those performed by Knazan. Knazan was found to be performing twice the average number of daily tallies. Smith and Buchite each prepared consolidated lists of observations and complaints and submitted them to Schonwetter for use in a September 8, 1986, meeting with respondent.

Smith's list of complaints included such things as: respondent would do her nails, spend up to 45 minutes every morning cleaning her contacts, be eating in the kitchen rather than answering her phone, make personal phone calls, leave her phone off the hook while at her desk, left work during an emergency mailing project, refuse to answer food program questions from Weight Watcher members, and submitted false time cards.

Buchite's list of complaints included such things as: respondent would wander away from her desk, would not take her share of phone inquiries, would arrive for work late, and would be late relieving the receptionist. Buchite testified she verbally informed Jan Schonwetter, prior to the September 8th meeting, of smelling alcohol odors on respondent.

At trial, witnesses testified to other aberrant behavior by respondent such as: staring out of windows, eight episodes of absenteeism (seven were on Mondays), an incident of slurred speech, indifference to a dropped lit cigarette, and a problem on August 29, 1986, when respondent wandered away leaving the reception desk unattended on at least three occasions. Witnesses also testified that periodically respondent would use the bathrooms on

first floor rather than on third floor where the central office was located.

Smith and Buchite's complaints about work conditions and respondent's performance deficiencies caused Schonwetter to call a meeting between herself, Moen, and respondent on September 8, 1986.

Respondent contends that at this meeting Schonwetter had some papers in front of her but never read from them. She testified that at this meeting Schonwetter made statements such as: "We've talked about your problem before;" "You commit yourself for three days and three weeks to St. Mary's this afternoon and if you do not choose to do so, you will be immediately terminated;" "Do you understand?"

Schonwetter testified she told respondent the problem was with her work performance, and that she showed respondent the list of complaints prepared by Smith and Buchite. Schonwetter said she believed they had something that could help. She said she told respondent they would pay her salary during alcohol abuse treatment and hold her job open if an evaluation showed treatment was necessary. Schonwetter went on to say if the evaluation showed alcohol was not the source of performance problems, respondent would be terminated for her poor work record.

The defamation claim was tried in May of 1990. The jury returned a special verdict which determined that appellant made a false statement about respondent, that the statement was published, that the statement was injurious to respondent, that appellant did not have a qualified privilege, and that respondent was damaged in the amount of $156,712.

Appellant brought motions for JNOV, a new trial, or remittur. Appellant's motion for JNOV asserted, in part, that it was entitled to a verdict in its favor because it enjoyed a qualified privilege, that the statements made were not defamatory, and that if they were, respondent had failed to establish compelled self-publication. The trial court adopted the jury finding that appellant did not have a qualified privilege, and stated that it found no qualified privilege as a matter of law. The trial court denied appellant's post-trial motions, finding no privilege existed because reasonable or probable cause was lacking when the offending statements were made.

## ISSUE

Was Weight Watchers entitled to JNOV because it held a "qualified privilege" when its employees discussed possible alcohol abuse with another employee?

## ANALYSIS

*Privilege*

█ The first issue is whether appellant, as an employer, had a qualified privilege regarding the alleged defamatory statement that respondent had an alcohol problem.

The doctrine of privileged communication rests upon public policy considerations. * * * [T]he existence of a privilege results from the court's determination that statements made in particular contexts or on certain occasions should be encouraged despite the risk that the statements might be defamatory.

*Lewis v. Equitable Life Assurance Society of the United States*, 389 N.W.2d 876, 889 (Minn.1986). A public policy to encourage certain types of communications may establish a proper occasion as a matter of law. "Whether an occasion is a proper one upon which to recognize a privilege is a question of law for the court to determine." *Id.* However, more is required for a communication to be privileged.

[A] communication, to be privileged, must be made upon a proper occasion, from a proper motive, and must be based upon reasonable or probable cause.

*Id.* (quoting *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 256–57 (Minn.1980).

Appellant argues that a privilege may be based upon a public policy alone (i.e.: proper occasion/purpose), and that since Minnesota has a public policy favoring alcohol intervention, its statements made about respondent are or should be privileged.

█ There are Minnesota statutes premised on a public policy favoring the preven-

tion/treatment of alcoholism. *See e.g.,* Minn.Stat. § 254A.01 (1986) (it is state public policy to provide persons dependent on alcohol or other chemicals with a comprehensive range of rehabilitative and social services); Minn.Stat. § 254A.03, subd. 1 (1986) (provides for the Department of Human Services to increase public efforts and awareness of chemical dependency treatment and prevention); Minn.Stat. §§ 254A.04, 254A.05 (1986) (creates a Citizens Advisory Council for Alcoholism and Drug Abuse); Minn.Stat. § 254B.01–10 (1986) (creates a Chemical Dependency Treatment Fund for chemical dependency services to low income persons).[1] However, public policy alone, although significant, is not always sufficient to make a communication privileged.

Public policy encouraging certain communication is a threshold consideration. To be privileged, the communication must still be made from a proper motive and upon reasonable cause. The Minnesota Supreme Court has stated:

> [q]ualified privilege rests * * * on more than having a proper occasion and purpose. The employer must also have reasonable or probable grounds for believing in the validity of the statement[.]

*Wirig v. Kinney Shoe Corp.,* 461 N.W.2d 374, 380 (Minn.1990).

The trial court let the issue of qualified privilege go to the jury. The jury returned a special verdict interrogatory finding that appellant did not have a qualified privilege. Even applying the strict standard of review called for on denied motions for JNOV, *see e.g. Lamb v. Jordan,* 333 N.W.2d 852, 855 (Minn.1983), the trial court should have found appellant had a qualified privilege to discuss with respondent a possible chemical abuse problem. Based on the evidence in the record, reasonable minds could not have differed on the propriety of appellant, an employer, at least attempting to discuss with respondent, one of its employees, a possible alcohol problem. Appellant's witnesses testified to a recurring odor of alcohol coming from respondent. Concurrent with these odors was a decline in respondent's work performance. Appellant's management personnel had a reasonable basis to believe the odor of alcohol could be related to respondent's work deficiencies. In addition to a decline in productivity, other aberrant behavior by respondent during the relevant period included: respondent doing her nails while the phone rang; spending several minutes in the morning in the company bathroom before going to her desk; eating in the kitchen rather than answer her phone; making personal phone calls; leaving the phone off the hook while at her desk; being absent during an emergency mailing project; refusing to answer food program questions from Weight Watchers members; submitting false time cards; wandering away from her desk; arriving for work late; late relieving the receptionist; an incident of slurred speech; indifference to a dropped lit cigarette; leaving the reception desk unattended despite previous warnings; and eight instances of absenteeism of which seven occurred on Mondays.

The documented work deficiencies occurring during the same time frame that different co-workers noticed a recurring odor of alcohol about respondent. There were sufficient facts to give appellant's employees reasonable grounds to make fair inquiry as to whether respondent might have an alcohol problem. Concomitant with the right to make fair inquiry, appellant's employees had the right to discuss with respondent whether an evaluation and possible treatment might help. An employer does not have to be correct with mathematical precision to have a qualified privilege to discuss matters which may affect work performance with an employee. It is difficult to tactfully discuss possible chemical abuse with another person. Here it is clear respondent's supervisors attempted to proceed carefully. They were equipped with facts that would suggest to reasonable minds to inquire as to whether respondent had an alcohol problem and if so, what could be done.

---

**1.** These statutes have not substantially changed and reflect current public policy in Minnesota.

For a qualified privilege to exist, there needs to be a proper occasion, motive, and reasonable grounds. The existence of a qualified privilege is a question of law, and should not have been submitted to the jury. After the question was submitted to the jury, the trial court, in addition to adopting the jury finding of no privilege, made a separate finding that no privilege existed. We reverse because we find a qualified privilege did exist, and appellant's motion for JNOV should have been granted.

We note the jury left the issue of abuse of the privilege (malice) unanswered. The jury did so correctly because the jury was instructed not to decide the issue of malice if they found no qualified privilege. We find qualified privilege exists, but do not remand for a factfinding on the issue of malice because the record lacks any evidence upon which a reasonable jury could base a finding of malice on the part of appellant.

Because we reverse on the issue of existence of a qualified privilege, we do not reach the issue of compelled self-publication.

## DECISION

Appellant, as an employer, had reasonable cause to inquire into respondent's potential alcohol abuse as suggested by an unexplained decline in performance coupled with complaints from co-employees of an odor of alcohol on respondent. The totality of the circumstances justified fair inquiry by appellant.

We find, as a matter of law, appellant had a qualified privilege to inquire, and there are no facts to suggest appellant acted with malice toward respondent.

Reversed.