Harry R. NOBLE, Respondent,

C.K. of Hopkins, Inc., Plaintiff,

George J. Huber, et al., defendants and third party plaintiffs, Appellants,

v.

C.E.D.O., INC., f.k.a. Country Builders, Inc., Third Party Defendant,

Justus Lumber Company, Third Party Defendant, Respondent,

and

COUNTRY KITCHEN INTERNATIONAL, INC., et al., Defendants and Third Party Plaintiffs, Respondents,

v.

JUSTUS LUMBER COMPANY, Third Party Defendant, Respondent.

No. C2-84-1952.

Court of Appeals of Minnesota.

Sept. 17, 1985.

Review Denied Nov. 18, 1985.

Harry R. Noble, pro se.

C.K. of Hopkins, Inc., pro se.

Jerome S. Rice and Diane A. Kotula, Minneapolis, for George J. Huber, et al.

David K. Wendel, Minneapolis, for C.E. D.O., Inc., f.k.a. Country Builders, Inc., and Justus Lumber Co.

J. Patrick McDavitt, Minneapolis, for Country Kitchen International, Inc., et al.

Heard, considered and decided by RANDALL, P.J., and WOZNIAK and LANSING, JJ.

## OPINION

RANDALL, Judge.

Huber and Mann appeal from the order for judgment dated May 23, 1984, an order dated September 19, 1984, and a judgment entered October 25, 1984. The May 23, 1984, order for judgment is nonappealable. Rule 103.03, Minn.R.Civ.App.P.; *see also*, *Swicker v. Ryan*, 346 N.W.2d 367, 368 (Minn.Ct.App.1984). However, the September 19, 1984, order and the judgment entered October 25, 1984, made within the proper time limits, are appealable. Huber and Mann appeal the trial court's denial of their motions for amended findings, a new trial, or judgment notwithstanding the verdict (JNOV).

## FACTS

In 1975, appellants Huber and Mann, signed an application to purchase a Country Kitchen restaurant franchise on a "turnkey" franchise agreement. Both Country Kitchen International ("CKI") and its subsidiary Country Properties, Inc. ("CPI") are respondents in this action and will be collectively referred to as CKI in this opinion.

Under the "turnkey" agreement CKI was responsible for the physical aspects of the franchise including site location and construction. Huber and Mann were given input into site selection; however, the ultimate location decision was reserved for CKI. Huber and Mann were responsible for cleaning the restaurant building prior to opening once construction was completed, for hiring and training staff, and for minimal interior decoration decisions.

Huber and Mann informed CKI of a potential site next to Justus Lumber Company ("JLC"). CKI already knew of the location and, together with Country Properties, Inc. ("CPI"), it negotiated an agreement with JLC to lease the land and the building from JLC. Negotiations included setting the amount of the rental payments Huber and Mann were to make. Huber and Mann were not involved in these negotiations.

On November 9, 1975, CPI entered into a "net-net" lease for the restaurant and land with JLC.

During negotiations, JLC disclosed to CKI that the restaurant site had once been a landfill dump. CKI informed appellants that the property was once a landfill but did not tell them of the possible consequences of building on a landfill. CKI did not disclose that building on a landfill would require pilings to be placed beneath the building, which would not only increase construction costs but also Huber and Mann's rent payments. Landfills generate an explosive methane gas.

Dave Gustafson, CKI's franchise director, was present at a meeting where Mr. Huibregtse of JLC showed some CKI employees and Chuck Eland of Country Builders, Inc. ("CBI"), the venting system JLC had installed in its warehouse located next to the proposed restaurant site on the same landfill to vent off methane gas from beneath its building.

On November 11, 1975, Huber and Mann, not yet incorporated but using the name Country Kitchens of Hopkins ("CK/H"), entered into a license agreement, a building lease, and a sign lease with CKI. The license, lease, and sign agreements bound Huber and Mann individually and as CK/H, Inc., which was incorporated on November 28, 1975, after the leases and license agreement were signed.

Appellants successfully ran the business and decided, in spring of 1979, to sell to

Noble. They transferred all their stock in CK/H to Noble by a stock purchase agreement dated June 8, 1979, for $225,000. They remained as personal guarantors for Noble on the franchise and lease agreements under the stock transfer agreement terms.

Noble's operation of CK/H was fraught with problems. His partner embezzled money, the quality of the service and food declined, and Noble was under fire from the Board of Health. In addition to these problems, he noticed a noxious smell in the restaurant which was ultimately determined to be methane gas generated from the landfill beneath the floor. The restaurant was temporarily closed by the health department and a venting system was installed.

A dispute arose among Noble, Huber and Mann, and CKI over who was responsible for correcting the gas leak. The fire marshall and health department approved reopening the restaurant in December, 1979, but Noble decided not to reopen. Pursuant to a written agreement, he transferred his stock back to appellants who, in turn, agreed to assume all liabilities to CKI under the license and lease agreements. The parties agreed to place the proceeds from the sale in escrow pending a judicial determination of proper distribution of the proceeds. Ultimately the trial court awarded this money to Huber and Mann to reduce their damage award.

Appellants sold the restaurant to Diebbs on February 4, 1980, for $175,000.

Noble sued Huber, Mann and CKI in March, 1980, for rescission of the stock sale agreement. He asserted claims for compensatory and punitive damages based on fraud and failure to disclose the dangers posed by methane gas. Appellants counterclaimed for breach of the stock purchase agreement. CKI denied Noble's claims and counterclaimed for unpaid license and rental fees personally guaranteed by Huber and Mann for CK/H. Noble amended the complaint to join JLC.

Appellants crossclaimed against JLC for indemnification and damages alleging that JLC and CKI fraudulently concealed the potential methane gas problem in connection with the license and lease agreements and the Minnesota Franchise Act, Minn. Stat. § 80C (1984). CKI denied the claims, raised the Franchise Act's statute of limitations as a defense, and crossclaimed against appellants for default of their guaranty of CK/H's payments. Appellants amended their complaint to join CBI.

Shortly after he took over CK/H, Diebbs defaulted on his license and lease obligations to CKI and its promissory note to appellants. To mitigate damages and to resolve the dispute relating to Diebbs' default, CKI and appellants entered into a limited mutual release releasing claims arising out of Diebbs' default.

The claims between Noble, appellants, CKI, CPI, and JLC were settled after the trial. The only remaining issues are between appellants and CKI, CBI, CPI, and JLC.

The trial lasted approximately six weeks. The jury sat as an advisory jury as to Nobles' recission claim and as a fact-finding jury as to the claims for money damages.

The trial court overturned portions of the jury verdict pertaining to the Huber and Mann claims against CKI. Where the jury had found CKI and JLC had committed fraud and that CKI violated the Franchise Act, the court set aside the jury findings and found that only JLC had committed fraud and that CKI had not violated the Franchise Act.

JLC, CKI and Huber and Mann filed post trial motions for a new trial or amended findings. Huber and Mann also moved for a JNOV. The trial court denied all motions.

## ISSUES

1. Did the trial court err in setting aside jury findings that CKI and CPI committed fraud and violated the Franchise Act?

2. Did the trial court err in ordering appellants to pay rent, interest, and attorney fees as Noble's guarantor?

3. Did the trial court err in refusing to award attorney's fees and costs for Franchise Act violations?

4. Did the trial court err in refusing to award Huber and Mann prejudgment interest under fraud and Franchise Act claims?

5. Did the trial court err in setting aside the jury verdict as to the Diebbs default?

## ANALYSIS

### I.

#### A. *Role of the jury*

This is a procedurally complex case involving allegations of fraud and violations of the Minnesota Franchise Act. The trial lasted over six weeks, the transcript consumed over 4,000 pages. At a point during the trial, the parties' attorneys and the court apparently conducted a lengthy in-chambers, off-the-record discussion on the role of the jury. From isolated references in the transcript and from language in the trial court order, it is apparent that all parties and the court agreed that the jury was sitting in an advisory capacity on Noble's recission claim, pursuant to Rule 39.-02, Minn.R.Civ.P.

However, respondents CKI and CPI also claim that the jury sat in an advisory capacity on the issues of whether CKI and CPI committed fraud in the sale of the franchise to Huber and Mann and on whether CKI violated the Franchise Act. They claim advisory findings do not bind the court. Because the only evidence to back their claim is a discussion conducted off the record, we must rely on the sparse written record, and that record is unclear.

In the absence of a motion or other written record, we rely on the language in the trial court's order, which is also ambiguous on which issues were advisory. The order states:

> The jury was sitting in an advisory capacity as to plaintiff Noble's claim for rescission pursuant to Rule 39.02 Minn. R.Civ.P. Certain factual matters affecting Noble's claims, as well as the claims of other parties, were reserved by the

Court or were not submitted to the jury as part of the special verdict.

■ In the absence of any other written record as to which claims may be advisory, we find that only the section of the special verdict pertaining to Noble's claims is advisory.

Resolution of this issue is necessary to determine the standard of review. The trial court overturned four jury findings pertaining to CKI, CPI, Huber, and Mann, on which the jury was not sitting in an advisory capacity, all of which are at issue on appeal. In the absence of a written record, we find, based on the language in the trial court's findings of fact, conclusions of law, and order, that the jury sat in an advisory capacity as to Nobles' rescission claim only.

■ The Rules of Civil Procedure provide:

> In all actions not triable of right by a jury the court, upon its own initiative, may try an issue with an advisory jury, or the court, with the consent of both parties, may order a trial with a jury whose verdict has the same effect as if trial by jury had been a matter of right.

Minn.R.Civ.P. 39.02. Equitable claims are not triable by jury as a matter of right. *Georgopolis v. George*, 237 Minn. 176, 186, 54 N.W.2d 137, 143 (1952). When the court empanels an advisory jury, it must make its own findings of fact. Although advisory findings do not bind the court, the clearly erroneous standard of review applies to the trial court findings. *Hubbard v. United Press International, Inc.*, 330 N.W.2d 428, 441 (Minn.1983). Under this standard, the findings of the trial court will not be disturbed if they are reasonably supported by evidence in the record considered as a whole. *Id.*

■ However,

> [T]he findings of a jury under a special verdict are binding on the court. * * * However, * * * the trial court has the same authority to set aside and change an answer to a question in a special verdict as it has to grant judgment notwithstanding a general verdict, that is,

where the evidence requires the change as a matter of law. * * * The test applied, be it on the trial or appellate level, is whether or not the evidence in the case established as a matter of law that a jury's answer to a question must be changed.

*Orwick v. Belshan,* 304 Minn. 338, 343, 231 N.W.2d 90, 94 (1975) (citations omitted). The standard for JNOV is that the decision should not be upset unless it is manifestly contrary to the evidence. *Sabasko v. Fletcher,* 359 N.W.2d 339, 342 (Minn.Ct. App.1984) (citations omitted), *pet. for rev. denied* (Minn. March 3, 1985).

It is unnecessary to analyze the balance of the interrogatories pertaining to Noble. Since Noble settled all claims with all parties at the close of testimony prior to jury deliberations, the interrogatory issues pertaining to his claims are moot.

In summary, the trial court will not be reversed on appeal for setting aside the findings of an advisory jury unless the trial court is clearly erroneous. Here the trial court was not clearly erroneous in its use of the advisory findings on recission and Noble's settlement rendered that issue moot.

However, where the jury is not advisory, but sits as finder of fact, as this jury did on all Huber and Mann and CKI claims, the trial court must meet the same standards as for a JNOV, that is, the jury's findings should not be set aside unless manifestly contrary to the evidence. *Id.*

### B. *Fraud claim*

In Part III, A of the special verdict, the jury found CKI and JLC committed fraud and violated the Minnesota Franchise Act. They awarded $173,860.00 for the fraud claim and $.00 for the Franchise Act claim.

■ The trial court acknowledged the jury findings but set aside findings that CKI committed fraud and Franchise Act violations. This setting aside constituted a JNOV. A trial court reviewing jury findings for JNOV shall not set aside those findings if supported by "*any* competent

evidence reasonably tending to support the verdict." *Newmaster v. Mahmood,* 361 N.W.2d 130 (Minn.Ct.App.1985) (citations omitted) (emphasis in original).

The jury could reasonably have concluded from the testimony presented that CKI made false, knowing representations. CKI had expertise in restaurant construction and knew, or should have known, that when a structure is built on a landfill, a methane gas problem can exist.

The jury had before it evidence that JLC built on the same landfill, had methane problems which it found necessary to install vents to correct. Testimony relating the substance of numerous meetings between CKI, CPI, and JLC was presented to the jury. At these meetings, the restaurant's construction was discussed in detail. Present at one of these meetings were Mr. Huibregtse of JLC, and Mr. Gustafson of CKI. Mr. Huibregtse took a number of the persons present to view the JLC venting system. Although Gustafson apparently did not view the venting system, conflicting testimony on whether he knew the participants were going to view the venting system was introduced. The jury could reasonably have concluded that he knew the purpose of the trip next door to JLC.

The question of CKI's knowledge of the existing methane problem at JLC went to the jury. Judging the credibility of the witnesses was the province of the jury. Mr. Gasior of Country Buildings, Inc. ("CBI") knew of the methane potential at the time of construction. Gasior met with Mr. Ozment, an officer of both CBI and CKI. The jury could reasonably have accepted appellant's inference that the two discussed the venting problem and that CKI had knowledge.

Moreover, other evidence supported the finding that CKI committed fraud. CKI's architect analyzed soil borings of the site which revealed the presence of methane. In addition, during an inspection by the fire marshal, a representative of CKI hurriedly opened doors in the restaurant to allow methane fumes to escape.

Finally, evidence indicating that construction decisions were made by CKI, CPI, and JLC, not by Huber and Mann was presented to the jury. Testimony showed that the decision not to vent was a cost saving consideration made by CKI and JLC. JLC apparently maintained that any venting could be installed as needed, when the gas became a problem. This was crucial to the issue of nondisclosure.

■ Given this evidence, the jury could and did reasonably conclude that CKI and CPI, along with JLC, committed fraud. The trial court's decision to set aside the jury verdict was erroneous because sufficient competent evidence existed to support the jury's verdict. We reinstate the jury's verdict as to the fraud claims against CKI and CPI.

## C. *Franchise Act violations*

Respondents argue that the trial court correctly set aside jury findings that CKI violated the Franchise Act because, as a matter of law, Minn.Stat. § 80A.01 (1984), parallel to Minn.Stat. § 80C.13, subd. 2 (1984), under which respondents were found to have committed violations, requires scienter. Appellants cite a district court memorandum on jury instructions which analyzes § 80A.01, the Minnesota Security Law, in depth and concludes that scienter is not a necessary element of a Securities Regulation violation. Minn.Stat. § 80A.01(b).

Appellant points out that the Minnesota Supreme Court has not decided whether scienter is a requirement of either § 80A.01 or § 80C.13. We find it unnecessary to undertake an analysis based on § 80A.01 or to determine whether § 80A.01 requires scienter. The plain meaning of § 80C.13, subd. 1 is applicable to this case:

No person may *make or cause to be made any untrue statement of a material fact* in any application, notice, report, or other document filed with the commissioner under sections 80C.01 to 80C.22, *or omit to state in any such application, notice, report or other document any material fact which is re-*

*quired to be stated therein,* or fail to notify the commissioner of any material change as required by section 80C.07. (Emphasis added).

It is clear that respondents made an untrue statement that the restaurant could be operated safely. It is also clear that they omitted including a statement relative to the potential methane hazards. The jury could reasonably have concluded that CKI and CPI violated the Franchise Act.

Moreover, in its memorandum accompanying the judgment, the trial court based its reversal of the verdict against CKI and CPI on its own factual finding that CKI and CPI were not told of Justus' methane problems nor did they know of a potential methane problem at the adjacent restaurant site, not on a legal finding of lack of scienter.

The jury, presented with evidence that CKI and CPI did know of the methane problem, found, based on the facts, that CKI and CPI had actual knowledge and did not disclose to Huber and Mann.

■ We hold that the jury's factual finding is supported by competent evidence, and the trial court erred in overturning that jury finding, and find it unnecessary to determine whether 80C.13 requires scienter.

## II.

### *Appellants' guaranty*

Under the terms of the stock transfer agreement signed by Noble and appellants, appellants remained personally liable as guarantors. The stock transfer agreement transferred to Noble the license, lease, and sign lease of CK/H.

In its special verdict, the jury found that Noble breached the license, lease, and sign lease agreements and was liable to CKI for $12,619.11 as a result. The trial court set aside this finding and held Huber and Mann liable not only for $12,619.11 but also for $3,028.56 prejudgment interest and $4,206.00 for attorneys fees.

The court granted Noble rescission of the stock purchase agreement based on mutual mistake and awarded him $38,000— the $35,000 stock purchase price, $1,000 transfer fee, and $2,000 prejudgment interest and attorneys fees. The court also ruled that Huber and Mann were entitled to full indemnification from JLC for any amounts they were required to pay Noble, but not for amounts due to CKI. This left appellants responsible, as Noble's guarantors, for $19,853.67 under the sign, license, and lease agreements.

A trial court setting aside jury factual findings is not entitled to deference on appeal. The jury's verdict will be upheld if there is any competent evidence reasonably tending to support the verdict. *Newmaster v. Mahmood,* 361 N.W.2d 130, 133 (Minn.Ct.App.1985).

As a matter of law, however, the jury's verdict must be set aside. *See, Orwick v. Belshan,* 304 Minn. 338, 343, 231 N.W.2d 90, 94 (1975). The trial court rescinded the stock purchase agreement between Noble and appellants which also voided Noble's obligations under the license, lease, and sign lease agreements, assets of the corporation.

Appellants' guaranty was part of the stock transfer agreement and, as such, conditioned on the existence of the underlying contract. The trial court rescinded the stock purchase agreement between Noble and appellants based on mutual mistake. Huber and Mann cannot act as guarantors of a non-existent contract.

Likewise, due to the trial court's rescission of the stock purchase agreement, Noble cannot be held liable under the license, lease, or sign lease agreements.

This court need not afford deference to the trial court when reviewing questions of law. *Durfee v. Rod Baxter Imports, Inc.,* 262 N.W.2d 349, 354 (Minn. 1978); *A.J. Chromy Construction Co. v. Commercial Mechanical Services, Inc.,* 260 N.W.2d 579, 582 (Minn.1977). Here, since the trial court rescinded the stock purchase agreement, we hold as a matter of law that the trial court erred in holding appellants liable as guarantors.

## III.

### Attorney fees

Appellants claim the trial court erred by not awarding them attorneys fees under the Franchise Act, Minn.Stat. § 80C.17, subd. 3. Respondent claims this and all other Franchise Act claims are barred by the three year statute of limitations of Minn.Stat. § 80C.17.

Minn.Stat. § 80C.17, subd. 5 states: "No action may be commenced pursuant to this section more than three years after the franchisee pays the first franchise fee."

The original summons and complaint were filed March 13, 1980; appellants crossclaim was filed July 9, 1982. The three year statute of limitations became effective July 1, 1981. Appellants argue that their crossclaim for attorneys fees should relate back to the date of the filing of the original summons and complaint. This arguments fails:

> For the purposes of the relation back doctrine, courts have distinguished between counterclaims and crossclaims that seek somehow to reduce the amount a plaintiff can recover, such as by recoupment, contribution, or indemnity, and claims that seek affirmative relief through an independent action. Defensive claims generally relate back, while affirmative claims must satisfy the applicable statute of limitations.

*Appelbaum v. Ceres Land Co.,* 546 F.Supp. 17, 20 (D.Minn.1981), affirmed on appeal 687 F.2d 261 (8th Cir.1982). Thus the statute was not tolled by filing the summons and complaint, and appellants' claim for attorney fees is barred by the statute of limitations.

## IV.

### Prejudgment interest

Appellants' claim for prejudgment interest under the Franchise Act is without merit. Appellants were awarded $173,-

861.00 as damages suffered as a result of the fraud and misrepresentation made by CKI and $.00 for the Franchise Act violation. Appellants cannot collect interest on a verdict of zero. This decision was well within the court's discretion and was not error.

■■■■ Appellants also claim prejudgment interest on fraud damages. Prejudgment interest is available on a liquidated claim, a sum certain, or an unliquidated claim if readily ascertainable by reference to generally recognized standards. *Clements Auto Company, Inc., v. Service Bureau Corp.*, 444 F.2d 169, 189 (8th Cir. 1971). However:

> It is also the rule in Minnesota that prejudgment interest is not allowed on unliquidated claims that are not readily ascertainable by computation or by reference to generally recognized standards, or *where the amount of the claim is dependent in whole or in part upon the discretion of the jury.*

*Id.* at 189 (citations omitted) (emphasis added). *See also Hueper v. Goodrich*, 314 N.W.2d 828, 831 (Minn.1982).

■■■ Here, several items of damage were submitted to the jury. They accepted some claims and rejected others. The damages were not liquidated, certain or readily ascertainable. Thus prejudgment interest is inappropriate and the trial court did not err.

## V.

### Release

After Noble ceased operating the restaurant, CKI found another purchaser, Diebbs. Under the terms of the agreement between CKI and appellants, CKI had ultimate authority to accept or reject prospective purchasers. Diebbs, who owned another CKI restaurant, was the only purchaser acceptable to both appellants and CKI. Shortly after Diebbs took over the Hopkins restaurant, CKI terminated his contract for this and Diebbs' other CKI restaurant for reasons unrelated to this suit, causing Diebbs to default on his note to Huber and Mann.

Subsequently on September 21, 1982, prior to trial, Huber and Mann executed a limited mutual release in which appellants returned, for $1.00 consideration, the franchise to CKI. Paragraph two of the release states:

> Huber and Mann, and each of them, do hereby release, acquit and forever discharge CKI and CPI and their respective directors, officers, agents, servants, associates, employees, stockholders, successors and assigns and each and all thereof, of and from any and all manner of actions, suits, claims, damages, judgments, levies and executions, whether known or unknown, liquidated or unliquidated, fixed, contingent, direct or indirect, which Huber and Mann ever had, have, or ever can, shall or may have or claim to have for, upon or by reason of any matter, act or thing arising out of, or in any way related to the Hopkins restaurant, from and after the sale of the restaurant operations and other assets by Huber and Mann to Diebbs, Inc. on February 4, 1980, including but not limited to any claims arising out of the default by Diebbs, Inc. or its guarantors of their obligations to Huber and Mann. *This Limited Mutual Release shall be without prejudice to any party with respect to claims, cross-claims, third-party claims, or other actions at issue in Civil File No. 765161, it being the intention of the parties that this Limited Mutual Release shall have no effect on Civil File No. 765161.*

The parties dispute the effect of the limited mutual release. Appellant claims that the Diebbs note was an element of this case, Civil File 765161.

Diebbs was in default to CKI for $52,239. Appellants claim Diebbs had defaulted on his note to appellants prior to the execution of the release, and that this is not the default contemplated by the release. The terms of the limited mutual release appear contradictory, given these facts.

Respondent argues that the language of the release covers both defaults. It is clear

from both parties' arguments that the release contemplated damages arising from Diebbs' default on the franchise agreement. It is also clear that the release is confusing.

■ A settlement agreement is presumed valid. *Sorensen v. Coast-to-Coast Stores, Inc.*, 353 N.W.2d 666, 669 (Minn.Ct. App.1984) *pet. for rev. denied* (Nov. 7, 1984). Factors necessary to rebut the presumption of a valid release are: lack of intent to release claims; whether the release language is complicated, confusing, or misleading; effect of absence or presence of counsel; existence of fraud or misrepresentation which touches the release; mutual mistake of fact where defendant has wrongfully concealed facts from the plaintiff or induced the mistake in some other way; or duress caused by economic coercion. *Id.* at 669–670.

■ To show economic coercion, a party must allege that he involuntarily accepted the terms of the release, that the circumstances allowed only that alternative, and that the other party created the compelling circumstances through compelling acts. *Id.* at 670 (citations omitted).

Here the facts alleged by appellants show economic coercion. The entire franchise agreement, personally binding appellants as guarantors of all subsequent purchasers yet reserving to CKI alone the right to select purchasers, creates a basis of coercion. When Diebbs was chosen by CKI to succeed Noble, CKI was simultaneously demanding that appellants make license, lease, and sign lease payments as guarantors.

Following Diebbs' default, respondents renewed these claims. Appellants signed over their interest in CK/H in the release to mitigate their damages resulting from the Diebbs' default. Finally, Diebbs' default on his note to appellants was caused by CKI's revoking Diebbs' franchises on both of his CKI restaurants.

■ These factors, combined with the language in the release preserving all claims in the litigation, support the contention that the release was not intended to release the claim for Diebbs' default on the note to appellants.

■ The jury found this default was a direct and proximate result of fraud committed by CKI and Justus and we will not disturb that finding. The trial court erroneously set aside the jury award to Huber and Mann for the Diebbs' note.

## DECISION

1. The trial court erred in setting aside jury findings that CKI and CPI committed fraud and violated the Franchise Act.

2. The trial court erred in ordering appellants to pay rent, interest, and attorney's fees as Noble's guarantor. Rescission of the stock purchase agreement relieves appellants from their duty to pay rent as guarantors under the agreement.

3. The trial court did not err in refusing to award attorney's fees and costs for Franchise Act violations.

4. The trial court did not err in refusing to award Huber and Mann prejudgment interest under fraud and Franchise Act claims.

5. The trial court erred in setting aside the jury verdict as to the Diebbs' default.

The jury verdict that CKI committed fraud and Franchise Act violations is reinstated. Neither appellants nor Noble are liable for rent payments during the period Noble was allegedly in default. The jury's damage verdict for fraud is reinstated.

Affirmed in part, reversed in part.