Susan **DUNN**, et al., Respondents (A06–396), Appellants (A06–397),

v.

**NATIONAL BEVERAGE CORP.**, a Delaware corporation, et al., Appellants (A06–396), Respondents (A06–397),

**DTM Distributing, Inc.**, Defendant (A06–396), Respondent (A06–397).

Nos. A06–396, A06–397.

Court of Appeals of Minnesota.

April 3, 2007.

Phillip R. Krass, Benjamin J. Court, Krass Monroe, P.A., Minneapolis, MN, for Susan Dunn, et al.

John Edward Connelly, Fiona B. Ruthven, Faegre Benson LLP, Minneapolis, MN, for National Beverage Corp., et al.

Leif E. Rasmussen, Edina, MN, for DTM Distributing, Inc.

Considered and decided by STONEBURNER, Presiding Judge; KALITOWSKI, Judge; and COLLINS, Judge.

## OPINION

COLLINS, Judge.[*]

In these consolidated appeals from the district court's denial of posttrial motions and judgment, National Beverage Corp. argues that (a) the determination that it was a party to the 1972 franchise agreement is erroneous as a matter of law; (b) the evidence regarding the contract claim was insufficient as a matter of law to support the jury's findings; and (c) the evidence regarding the defamation claim was insufficient as a matter of law to support the jury's findings. The Twin City Home Juice Co. parties argue that the district court erred as a matter of law in denying their motion for attorney fees pursuant to Minn.Stat. § 80C.17, subd. 3 (2006). Because the evidence was sufficient to support the jury verdict and the district court did not err as a matter of law, we affirm.

## FACTS

On August 1, 1972, Twin City Home Juice Co.[1] (Twin City), a company that sold and distributed fruit-juice drinks, entered into a franchise agreement with Home Juice Co. ("Chicago Home Juice"). The agreement gave Twin City "the right to use the brand names Home Juice, Mr. Pure, Dairy–Hi, Lady Carolyn, and Everfresh as the brand names for its products within Twin City's marketing area" for ten years. It further provided that Chicago Home Juice "will not sell the products which it manufactures to any customer within Twin City's marketing area ... without first obtaining written approval from Twin City." The franchise agreement was extended for an additional ten years under the terms of the 1972 agreement effective October 1, 1995.

At the time of the events at issue in this lawsuit, Twin City was owned by father and daughter Art and Sue Dunn and the latter's husband, Richard Newstrom. Art Dunn died prior to the trial.

On May 14, 1999, National Beverage Corp.[2] acquired Chicago Home Juice's[3] assets. Although the sales agreement did not specify the 1972 franchise agreement, it did include assets used or necessary in the operation of the business, even if those assets did not appear on the balance sheet, unless specifically excluded. National Beverage sent a letter to Twin City and other Chicago Home Juice distributors on May 12, 1999, shortly before the sale, advising that the letter superseded any exist-

---

[*] Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

1. Although its name has since been changed, we refer to this entity by its historical name of Twin City Home Juice Co.

2. Several corporate entities related to National Beverage as well as National Beverage were involved in the events leading to this lawsuit; they will be referred to collectively as National Beverage.

3. Chicago House Juice at this time was a division of American Citrus Products Corp. but it will continue to be referred to as Chicago Home Juice.

ing distributor agreements with Chicago Home Juice, that such agreements had not been assigned to National Beverage as part of the sale, and that the distributors could continue on a year-to-year basis as long as they met certain standards. Sue Dunn and another distributor testified at trial that they had not received this letter. Twin City continued to distribute the products that National Beverage acquired from Chicago Home Juice after the sale without interruption and in the same manner as before the sale.

In 2001, several changes occurred in Twin City's distribution business. At that time, distribution of the beverage South Beach (SoBe) constituted about 40% of Twin City's routes; other routes constituted 20%; and for the remaining 40% of the business, Twin City filled orders from sub-distributors. In the summer of 2001, Pepsi purchased SoBe. Because Pepsi distributed its own products, Twin City lost the SoBe distribution business, but it received $600,000 from Pepsi based on a buy-back clause. Twin City then decided to divest itself of its remaining distribution routes and instead to fill orders only from subdistributors. Accordingly, on July 9, 2001, Twin City entered into an agreement with Tri–County Beverage & Supply, Inc. (Tri–County), owned by Ronald Kocina, for Tri–County to become Twin City's subdistributor for certain routes.

In November 2001, Art Dunn sent a letter to National Beverage raising some grievances, including that National Beverage denied the franchise, and suggesting that National Beverage buy out the Twin City franchise. National Beverage indicated that it would consider doing so and, pursuant to the proposal, that it would send Twin City a confidentiality agree-

ment. But the confidentiality agreement was sent to the wrong address, and Twin City did not receive it until mid-January 2002. By that time, Twin City was negotiating to sell its business to Service Distributing (Service), owned by Mark Leikam.[4] Because National Beverage's confidentiality agreement also contained a provision prohibiting Twin City from negotiating with anyone else, Twin City did not sign it.

On March 29, 2002, Service and Twin City entered into an asset-purchase agreement, in which Service agreed to make 48 monthly payments of $6,000, totaling $288,000, beginning six months after the closing date, with additional payments possible up to a maximum of $350,000. Twin City advised the manufacturers, including National Beverage, of the sale in an April 12, 2002 memo. Twin City's last order to National Beverage was on April 3, 2002. Dunn acknowledged that after April 5, 2002, she no longer owned Twin City.

Shortly thereafter, Service ended the subdistribution relationship that Twin City had entered into with Tri–County after Tri–County had tendered an insufficient-funds check. In spring 2002, Service selected DTM Distribution, Inc. (DTM) owned by Dan McNaughton, to be its new subdistributor, and advised National Beverage in early May. National Beverage began selling Mr. Pure products to Service on May 14, 2002.

By June 2002, however, Leikam, the owner of Service, decided that he wanted to get out of his contract to purchase Twin City. National Beverage and Sue Dunn learned of this in late June 2002. Leikam found that it was too much of a strain on his employees to have all of the additional products, he did not feel he was making

---

**4.** The entity that purchased Twin City's assets was Beverage Enterprises, but it is referred to as Service Distributing by the parties.

the money he anticipated, and the deal was just not working out. In addition, according to Leikam's counsel, Service was having problems getting product from National Beverage. By mid-July 2002, Service *stopped ordering products from National Beverage* in order to run the inventory down as low as possible. In an August 23, 2002 letter to Service, National Beverage acknowledged that Service was no longer interested in carrying its products.

Meanwhile, Sue Dunn began investigating sale of the business to others. On July 1, 2002, she met McNaughton of DTM to discuss DTM's interest in purchasing Twin City, and McNaughton signed a confidentiality agreement with Dunn. At about the same time, however, McNaughton also met with National Beverage as to whether DTM could become a direct distributor and on July 9, acknowledged that he saw no value in purchasing Twin City. DTM filled out two credit applications, on July 9, 2002 and on August 27, 2002, which National Beverage required of those seeking to distribute its products.

Dunn also discussed selling the business to Tri–County. On August 26, 2002, she and Tri–County entered into a stock purchase agreement; executed a promissory note for $375,000 for the assets of the company; and signed a pledge agreement, a third-party security agreement, and employment and noncompete agreements. But on August 26, 2002, DTM submitted a written request to buy products directly from National Beverage, which agreed to the request. DTM advised Tri–County that it was the authorized dealer for Mr. Pure products and that Tri–County was not. Tri–County then withdrew from its purchase of Twin City.

Evidence was presented that in early October 2002, McNaughton of DTM and representatives from National Beverage visited several convenience or grocery stores that had previously obtained Mr. Pure products from Twin City and made statements to the effect that DTM was the only authorized Mr. Pure distributor.

Twin City then brought this lawsuit against National Beverage and DTM. Following a trial, the jury found in relevant part that National Beverage became a party to the 1972 franchise agreement when it purchased the assets of Chicago Home Juice in 1999, and that it breached the franchise agreement, resulting in damages to Twin City of $288,000. The jury also found that National Beverage and Twin City had a franchise agreement under the act, which National Beverage had terminated or cancelled without good cause, but that Twin City had suffered no damages. Finally, the jury found that National Beverage and DTM defamed Twin City by stating that DTM was the only authorized Mr. Pure distributor and that Twin City had suffered damages of $64,369.45, all of which the jury attributed to National Beverage.

The parties then filed posttrial motions, including a motion by Twin City for attorney fees pursuant to Minn.Stat. § 80C.17, subd. 3 (2006). The district court denied all posttrial motions and ordered judgment, which was then entered. National Beverage filed a notice of appeal challenging the judgment and denial of its posttrial motions. Twin City appealed and challenged the district court's denial of its motion for attorney fees. DTM, which was not found liable for any damages, did not appeal. This court consolidated the appeals.

## ISSUES

I. Did the district court err in ruling that the issue of whether National Beverage became a party to the 1972 franchise agreement when it purchased the assets of

Chicago Home Juice was a question of fact for the jury?

II. Did the evidence support the jury's findings as to Twin City's breach-of-contract claim against National Beverage?

III. Did the evidence support the jury's findings as to Twin City's defamation claim against National Beverage?

IV. Did the district court err in denying Twin City's motion for attorney fees under the Minnesota Franchise Act, Minn. Stat. § 80C.17, subd. 3 (2006)?

## ANALYSIS

### I.

National Beverage first contends that the district court erred as a matter of law when it submitted to the jury the issue of whether National Beverage assumed Twin City's 1972 franchise agreement as part of its 1999 asset purchase of Chicago Home Juice. National Beverage argues that because it did not, it is not a party to the 1972 agreement and cannot be held liable for its breach.

■■ National Beverage raised this issue in motions for summary judgment, directed verdict, and judgment notwithstanding the verdict, all of which the district court denied.[5] This court will review an appeal from a denial of summary judgment "to determine whether a genuine issue of material fact exists and whether the law was correctly applied." *Murphy v. Allina Health Sys.,* 668 N.W.2d 17, 20 (Minn.App.2003), *review denied* (Minn. Nov. 18, 2003). This court will review a district court order denying a motion for directed verdict or JNOV de novo. *Langeslag v. KYMN Inc.,* 664 N.W.2d 860, 864 (Minn.2003).

■■ "The construction and effect of a contract are questions of law for the court." *Turner v. Alpha Phi Sorority House,* 276 N.W.2d 63, 66 (Minn.1979). "[T]he language found in a contract is to be given its plain and ordinary meaning." *Id.* at 67. "Whether there is ambiguity in a contract is a legal determination in the first instance." *Republic Nat'l Life Ins. Co. v. Lorraine Realty Corp.,* 279 N.W.2d 349, 354 (Minn.1979). If the contract language is susceptible to more than one construction, it is ambiguous. *Id.* When the contract is ambiguous and its "construction depends upon extrinsic evidence and a writing, there is a question of fact for the jury." *Turner,* 276 N.W.2d at 66.

■■ "Minnesota follows the traditional approach to corporate successor liability." *Niccum v. Hydra Tool Corp.,* 438 N.W.2d 96, 98 (Minn.1989). As the supreme court put it, "where one corporation [sells or otherwise] transfers [all of] its assets to another corporation ..., the latter is not liable for the debts [and liabilities] of the transferring corporation," except for four exceptions not at issue here. *J.F. Anderson Lumber Co. v. Myers,* 296 Minn. 33, 41, 206 N.W.2d 365, 370 (1973).

We will first review the relevant contract language. In the 1999 asset-purchase agreement, the assets to be acquired by National Beverage were listed in Schedule 1;

> *All business, properties and assets of every kind and description, whether real, personal or mixed, tangible or intangible, wherever located, used or necessary in the operation of the Business,* free and clear of all liens, encumbrances and interest of any kind including, without limitation:

---

**5.** National Beverage advises that because the discovery process and trial added virtually nothing to the body of evidence, the same arguments apply to its claims that the district court erred in denying its motions for summary judgment, directed verdict, and JNOV.

. . . .

(g) all contracts listed on Schedule 1(g) hereof;

. . . .

(i) *all other property owned or leased ... that is used by or in connection with the Business,* whether or not reflected on the most recent balance sheet. . . .

(Emphasis added.) The only contracts listed on Schedule 1(g) are two manufacturing agreements that are not relevant to the issues raised here. Next, Schedule 2, "Liabilities Assumed," provides that National Beverage assumed only the liabilities attached to the schedule and "no others of any kind or nature." It states: "Except as set forth in the Amendment and Schedules, neither NBC nor HJA shall assume any obligation, duty or liability of [Chicago Home Juice]. . . ."

Finally, the "Bill of Sale, Assignment and Assumption Agreement" provides that pursuant to the purchase agreement

the Seller hereby grants, conveys, sells, assigns, transfers and delivers to the Purchaser, all of its right, title, interest and benefit in and to the business properties and assets of the Seller of every kind and description, whether real, personal or mixed, tangible or intangible, wherever located (except as specifically excluded from this sale as described below and in the Purchase Agreement), *used or necessary in the operation of the Business, all as the same exist on the date hereof, whether or not appearing on the most recent balance sheet for the Seller* (collectively, the "Purchased Assets"), free and clear of any Lien. Without limiting the generality of the foregoing, the Purchased Assets *shall include, but not be limited to, the following:*

. . . .

(g) *Contracts. All contracts listed on Schedule 1(g) attached hereto;*

. . . .

(i) *Other Property. All other property owned or leased by the Seller that is used by or in connection with the business, whether or not reflected on the most recent balance sheet for the Seller.*

(Emphasis added.)

National Beverage argues that under asset-purchase law, unless the parties make a clear agreement to the contrary, an asset purchaser does not assume and is not liable for the predecessor's obligations. It cites several cases involving dealerships in which the purchaser was not liable under those agreements. *See Mitchell Mach., Inc. v. Ford New Holland, Inc.,* 918 F.2d 1366, 1369–70 (8th Cir.1990) (holding that asset purchaser did not become liable for dealership contracts where no language suggested such liability and purchase agreement expressly excluded sales and service agreements with terminated dealers); *Ernst v. Ford Motor Co.,* 813 S.W.2d 910, 916–17 (Mo.Ct.App.1991) (holding as a matter of law that asset purchaser did not assume obligation for terminated dealership contracts where record did not demonstrate that purchaser assumed liability for such contracts and purchase agreement expressly excluded agreements with terminated dealers from the assets purchased). Because the purchase agreement did not explicitly list the 1972 franchise agreement, National Beverage contends it was not part of the purchase.

■ Twin City does not claim that the 1999 purchase agreement explicitly listed the 1972 franchise agreement. Instead, it cites the express language of the asset-purchase agreement and bill of sale stating that the purchase included all assets "used or necessary in the operation" of the business or "used by or in connection with" the business whether or not they were reflected in the most current balance sheet.

It contends that this language renders the contract at least ambiguous as to whether the 1972 franchise agreement was included in the asset purchase.

National Beverage, however, asserts that Twin City focused on general language and disregarded the specific. It contends that an asset-purchase agreement must be construed in accordance with Florida law regarding statutory interpretation. "It is a general principle of contract interpretation that a specific provision dealing with a particular subject will control over a different provision dealing only generally with that same subject." *Kel Homes, LLC, v. Burris,* 933 So.2d 699, 703 (Fla.Dist.Ct.App.2006).[6] Further, it contends that it was National Beverage's clear intent to pick and choose which contracts to assume, and it did not intend to assume the 1972 franchise agreement.

It is undisputed that the 1999 asset-purchase agreement does not expressly include the 1972 franchise agreement. But, unlike the cases cited by National Beverage, there is no express exclusion of the 1972 franchise agreement. *Cf. Mitchell Mach.,* 918 F.2d at 1369 (expressly excluding terminated dealership contracts from asset purchase); *Ernst,* 813 S.W.2d at 916–17 (same). Next, the purchase agreement specifically includes assets that are used in and necessary to the business, even if they were not reflected on the balance sheet. In addition, the contract specified that the assets were not limited to those listed. Finally, as discussed in detail below, there was evidence that Na-

tional Beverage considered the distributors necessary to the business. We agree with the district court that whether the 1972 franchise agreement was included in the 1999 asset purchase was ambiguous and presented a question of fact for the jury.

## II.

National Beverage next challenges the jury's answers on the special verdict form as to breach of contract, contending that they were unsupported by the evidence and that the district court should have granted its motions for directed verdict and summary judgment.

On review, the district court must be affirmed if "there is any competent evidence reasonably tending to sustain the verdict," viewed in the light most favorable to the prevailing party. *Langeslag,* 664 N.W.2d at 864 (citation omitted). The verdict will not be set aside by the appellate court unless it cannot be sustained on any reasonable theory of the evidence. *Pouliot v. Fitzsimmons,* 582 N.W.2d 221, 224 (Minn.1998).

### A. Parties to 1972 franchise agreement

The jury first found that Twin City and National Beverage became parties to the 1972 franchise agreement[7] by virtue of National Beverage's purchase of the assets of Chicago Home Juice.

National Beverage argues that under the plain language of the 1999 asset-purchase agreement, and absent any evidence

---

**6.** National Beverage asserts that under the 1999 asset-purchase agreement, Florida law applies, but also states that the choice-of-law determination does not affect the outcome because the result is the same under all state law it has reviewed.

**7.** The jury-verdict form referred to the 1972 franchise agreement as the 1972 contract,

and it was later asked to determine whether there was a franchise agreement. Because the jury found there was a franchise agreement, which National Beverage does not challenge on appeal, and for the sake of clarity, we refer to it as the 1972 franchise agreement.

that the parties agreed to depart from the law regarding assumption of contract obligations in an asset purchase, the jury's answer to this question cannot stand as a matter of law. We have already resolved this argument above, ruling that the 1999 asset-purchase agreement was ambiguous as a matter of law and that resolution of whether National Beverage assumed the 1972 franchise agreement was a fact question for the jury.

■ We now review whether the jury findings can be sustained by any reasonable theory of the evidence. We first address whether the jury had evidence from which it could conclude that the 1972 franchise agreement regarding distribution was an asset used by or in connection with the business. At trial, the jury heard testimony from both Michael Perez, the executive from National Beverage who was in charge of the distributorships, and other distributors that it was an asset. Perez was questioned whether he considered the distribution network to be an asset. He first said: "We really don't," but then asked for a definition of the term distribution network. After the explanation, he said that he considered his distributors to be assets. At another point at trial, he acknowledged that the distributorship network was "essential and necessary." As he explained, while Pepsi has its own distributor network, National Beverage relies on others to distribute its product; without them, it would be out of business. It relies on the distributors, who have personal contacts in the stores, to position itself in the marketplace. While National Beverage argues that Perez's testimony merely shows his credibility and fairmindedness in agreeing that a good distributor adds value for a manufacturer, this is an argument for the jury as to how it should assess the evidence.

Twin City also called several nonparty witnesses who were distributors and had franchise agreements with National Beverage to testify. One testified that he considered his franchise an asset, explaining that it is "probably a two way street, with benefits and responsibilities on both sides." The other also considered his franchise as an asset to National Beverage.

National Beverage also argues that there was no evidence in the record that it was aware of the 1972 agreement or discussed it. Further, National Beverage argues that in its May 12, 1999 letter to the distributors, it specifically told them that it was not assuming the distributor agreements as part of the acquisition. But the jury heard testimony from Susan Dunn and another distributor that they did not receive this letter. Further, Perez acknowledged that some states imposed obligations regulating relationships between franchisees and franchisors, and that there was no indication National Beverage reviewed these laws to determine whether it met any such obligations.

The jury credited Twin City's version and found that Twin City and National Beverage became parties to the 1972 agreement by virtue of National Beverage purchasing the assets of Chicago Home Juice, and there is evidence to support the jury's findings.

## B. Breach

Next, Twin City asserted that National Beverage breached the 1972 franchise agreement when it sold its products directly to DTM in August 2002, in violation of the provision that sales of National Beverage's products in the relevant marketing area would be made exclusively to Twin City. The jury found that National Beverage breached the 1972 franchise agreement

National Beverage contends that the evidence presented to the jury showed that the distributorship agreement had been sold to Service and had not yet been returned to either Twin City or Dunn in August 2002, at the time the breach was alleged to have occurred. A breach-of-contract claim cannot be maintained when the rights vested in the contract have been assigned to another party. *See Pine Valley Meats, Inc. v. Canal Capital Corp.*, 566 N.W.2d 357, 365 (Minn.App.1997) (stating that trial court determined that party had no standing to assert claim when it had assigned its rights under contract to another), *abrogated on other grounds by Myers v. Hearth Tech., Inc.*, 621 N.W.2d 787 (Minn.App.2001), *review denied* (Minn. Mar. 13, 2001).

In support of its claim, National Beverage cites evidence that as of August 27, 2002 (the date of the first sale to DTM), Leikam, the owner of Service, still held the assets of Twin City. Leikam testified that at this time, he still had the assets of Twin City; although he was in the process of unwinding, it had not been completed. Consequently, National Beverage contends that it cannot be liable for a breach of contract with Dunn or Twin City.

Twin City contends that *Pine Valley* is distinguishable because there was no evidence there, as there was here, that the assignment was rescinded prior to the breach. Instead, Twin City cites evidence from trial that Twin City held the franchise rights at the time of the breach, based on a theory of rescission. "Whether a contract has been rescinded by mutual consent of the parties is a question for the trier of fact." *Berg v. Ackman*, 431 N.W.2d 264, 266 (Minn.App.1988). "Rescission must be clearly expressed, and acts and conduct of the parties must be positive, unequivocal, and inconsistent with the existence of the contract." *Id.* "A

repudiation by one party to a contract if acquiesced in by the other party is tantamount to a rescission." *Desnick v. Mast*, 311 Minn. 356, 365, 249 N.W.2d 878, 884 (1976).

Twin City cites testimony that Leikam repudiated the contract and returned the company to Dunn on June 27, 2002. Perez testified that he was aware on that date that Leikam had decided not to proceed with his purchase of Twin City. Dunn testified that at the end of June 2002, she learned that Leikam did not want to continue with the business. Although she initially told him to "make it work," she later said she would try to find someone else to purchase the company before he gave up completely. And by July 1, she met with DTM to discuss a sale. Leikam testified that in late June, he told Dunn that he wanted her to take the company back. Again, the jury was presented with two different versions of events and, again, it had evidence to support the version that it credited.

Next, National Beverage asserts another theory in support of its argument. It contends that both representatives of Service and National Beverage testified that they reached a new meeting of the minds as to the terms of their business relationship and agreed to National Beverage's standard at-will agreement with its wholesale customers. Perez testified that Leikam accepted National Beverage's position that it did not operate with a written contract, and Leikam testified that Perez told him that National Beverage does not have franchise agreements with its distributors. National Beverage contends that this oral agreement superseded the 1972 agreement, if any, and accordingly extinguished any rights that may have arisen under it. *See Krogness v. Best Buy Co.*, 524 N.W.2d 282, 286 (Minn.App.1994) (recognizing that "parties who have an express contract may

leave that agreement behind and so conduct themselves that a new contract must be implied from their behavior"), *review denied* (Minn. Jan. 25, 1995).

In response, Twin City contends that under Minnesota law, parties may not terminate franchise agreements orally or in any manner inconsistent with Minn.Stat. § 80C.14, subd. 3 (2002). Consequently, it asserts National Beverage could not terminate the franchise rights by entering into a "handshake" deal with Service. Further, we note that the jury concluded that National Beverage terminated or cancelled Twin City's franchise rights without good cause, and National Beverage does not challenge this finding.

National Beverage makes several additional arguments. It contends that Service abandoned performance of its obligations under the 1972 franchise agreement after June 19, 2002, when it stopped ordering product and attempted to run the inventory down as much as possible. National Beverage cites Minn. Stat. § 336.2–306(2) (2002), for the proposition that when an exclusive buyer stops performing, that buyer forfeits whatever rights it had to demand that the seller sell to no one else. A review of the section shows that it does not directly support the argument: "A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale." *Id.* Further, this was again a jury question.

Next, National Beverage argues that because Service breached the agreement first, National Beverage cannot be held liable for any alleged breach. *See Carlson Real Estate Co. v. Soltan,* 549 N.W.2d 376, 379–80 (Minn.App.1996) (holding "a party

who commits the first breach is deprived of the right to complain of a subsequent breach by the opposite party"), *review denied* (Minn. Aug. 20, 1996). It also contends that Leikam, who purchased Twin City's assets on March 29, 2002, did not object to National Beverage selling directly to DTM and therefore waived any breach. *See Appollo v. Reynolds,* 364 N.W.2d 422, 424 (Minn.App.1985) ("[i]gnoring a provision in a contract will constitute waiver ...."). Whether the comments constituted a lack of objection was a jury determination. National Beverage's arguments are based on the theory that the jury had no evidence to support its finding of a breach. As discussed above, Twin City presented evidence from which the jury could reasonably conclude that a breach occurred.

### C. Causation and damages

Finally, National Beverage contends that the jury's findings that National Beverage's breach was a direct cause of Twin City's damages and that Twin City was damaged in the amount of $288,000 is unsupported by the evidence. It focuses on the finding as to the amount of damages.

At trial, Twin City argued that the breach occurred when National Beverage gave DTM the right to sell its products and that as a result, Twin City's attempted sale of the assets to Tri–County failed. Both parties submitted evidence as to the damages, if any, Twin City suffered as a result. Twin City presented detailed evidence as to its claimed damages, which amounted to more than $1 million. National Beverage presented an expert, who testified that the proposed sale of Twin City's assets to Tri–County was not legitimate, that it failed to meet the established business-valuation standards for a bona fide offer, and that Twin City did not suffer any damages when the sale did not

go through. The jury, however, did not accept either of these figures. Instead, it found that Twin City suffered damages of $288,000, which was the amount that Service was to pay to Twin City for its March 29, 2002 asset-purchase agreement, before the deal was rescinded.

National Beverage argues that because the jury awarded this amount, it must have concluded that the breach for which it was awarding damages was for the failed Service purchase agreement. It contends that this is against the weight of the evidence, because there was no evidence that its actions caused Service to withdraw from the contract and, further, Twin City did not argue that it did.

Twin City contends that the damages it sought and the damages it was awarded were for the loss of the Tri–County deal. It argues that the jury, rather than accepting Twin City's claim that it lost over $1 million in the failed sale to Tri–County or National Beverage's claim that Twin City lost nothing, instead determined that Twin City's damages were $288,000. National Beverage's damages expert testified that Service's agreement for the purchase of Twin City for $288,000 was legitimate, and Twin City argues that the jury could have concluded that the value of what Twin City lost from the failed Tri–County sale was that same amount, $288,000. Further, the amount was within the range of damages submitted by the parties. National Beverage's contention that there was no evidentiary support for the jury's verdict is without merit.

### III.

Next, National Beverage challenges the jury's determination on Twin City's claim that DTM and National Beverage defamed it by making statements that DTM was the only authorized distributor of Mr. Pure products; which statements injured Twin City in its business, were intentionally or negligently published, and were not true. The jury awarded damages to Twin City of $64,369.45 and attributed all of the damages to National Beverage. National Beverage contends that it should not be liable for defamation as a matter of law.

▆▆▆ "In Minnesota, a plaintiff pursuing a defamation claim must prove that the defendant made: (a) a false and defamatory statement about the plaintiff; (b) in unprivileged publication to a third party; (c) that harmed the plaintiff's reputation in the community." *Weinberger v. Maplewood Review*, 668 N.W.2d 667, 673 (Minn. 2003). National Beverage contends that the evidence at trial does not support the jury verdict on any of these elements.

### A. Whether there was evidence that National Beverage personnel made the defamatory statements

In completing the special-verdict form, the jury was asked whether the "[d]efendants" made statements that DTM was the only authorized distributor of Mr. Pure products. The defendants were both National Beverage and DTM. National Beverage contends that there was no evidence before the jury that personnel from National Beverage made the statement.

Brad Mateer, a market owner, submitted an affidavit stating: "On October 2, 2002, Dan McNaughton of DTM Distributing, Inc. and David Sanchez of National Beverage Corp. visited my store and informed me that DTM was the only authorized distributor of Mr. Pure Products in the area." Mateer testified at trial as follows:

A. Well, [McNaughton] came in with a representative from Mr. Pure and told me he would be the distributor for Mr. Pure products.

. . . .

Q. Do you remember exactly what Mr. McNaughton and the representative from [National Beverage] told you?

A. He said that he would be the distributor in the area.

Q. And did he say anything else?

A. I don't know if he said he was exclusive or not. I know he said he would be the distributor in the area.

Q. So you understood that to mean that—

A. That he would be the one that would have the product from that particular time on.

Despite National Beverage's arguments as to the interpretation of this evidence, taking it in the light most favorable to Twin City, the jury could have concluded that National Beverage's representative made the statement.

Tim Stoffel, the owner of a grocery store that also sold Mr. Pure products, did not testify at trial, but he stated the following in his affidavit:

4. On October 1, 2002, Bill Biggerstaff, a DTM Distributing, Inc. representative, and David Sanchez of National Beverage Corp. visited my store and informed me that DTM Distributing, Inc. was the only authorized distributor of Mr. Pure products in this market.

5. Mr. Biggerstaff and Mr. Sanchez also said it was illegal for Home Juice Twin City to be distributing product in this market.

When Twin City's counsel cross-examined McNaughton about this exchange, McNaugton responded that he was not present during that exchange. There was evidence presented from which the jury could conclude that a representative of National Beverage also made the statement.

B. *Whether under Dunn and Twin City's theory of the case, the statements were false at the time they were made*

Next, National Beverage contends that the statements that DTM was the only authorized distributor of Mr. Pure products were not false when made in October 2002. An appellate court "will not overturn a jury finding on the issue of falsity unless the finding is manifestly and palpably contrary to the evidence." *Lewis v. Equitable Life Assurance Soc.,* 389 N.W.2d 876, 889 (Minn.1986). As a matter of law, a true statement cannot be defamatory. *Stuempges v. Parke, Davis Co.,* 297 N.W.2d 252, 255 (Minn.1980).

National Beverage first notes that Twin City alleged that National Beverage improperly terminated Twin City's authorization to sell Mr. Pure products in August 2002. It argues that under Twin City's own theory that its authorization to sell Mr. Pure products had been terminated, albeit improperly, it was not an authorized distributor of Mr. Pure after August 2002 and the alleged defamatory statements were truthful. Twin City argues that the parties disputed who the authorized distributor of Mr. Pure products was in the summer of 2002 and that under Minnesota law, National Beverage was unable to lawfully terminate the franchise.

National Beverage next argues that the alleged defamatory "statements" were subjective interpretations of the parties' legal status, which were not false for purposes of a defamation claim. "Only statements that present or imply the existence of fact that can be proven true or false are actionable under state defamation law." *Schlieman v. Gannett Minn. Broad., Inc.,* 637 N.W.2d 297, 308 (Minn. App.2001), *review denied* (Minn. Mar. 19, 2002). Interpretations, theories, and conjectures are not actionable. *Id.*

Twin City contends that the pertinent inquiry is whether the statements present or imply a provably false assertion of fact. *Marchant Inv. Mgmt. Co. v. St. Anthony W. Neighborhood Org., Inc.*, 694 N.W.2d 92, 96 (Minn.App.2005). The jury determines this by examining the broad context of statements, including the general tenor of the entire statement; "the specific context and content of the statements; ... the reasonable expectations of the audience; and whether the statement is sufficiently objective to be susceptible of being proven true or false." *Id.* At trial, store owner Mateer testified he understood from the statements that DTM was the only distributor of Mr. Pure products; grocery store owner Stoffel stated in his affidavit that DTM and National Beverage personnel who visited his store told him that DTM was the only authorized distributor and that it would be illegal for any other entity to distribute the product.

Where, as here, the facts are disputed, the truth of defamatory statements is a factual issue to be decided by the jury. *Lewis*, 389 N.W.2d at 889. The jury had evidence sufficient to support its finding.

### C. Whether the statements harmed Dunn's or Twin City's reputation in the community

Next, National Beverage contends that it was not defamatory to state that DTM was the only authorized distributor of Mr. Pure products. It contends that a statement is defamatory only if it disgraces and degrades the plaintiff, holds him or her up to public hatred, contempt, or ridicule, or harms the plaintiff's reputation or lowers the plaintiff in the estimation of the community. *See Advanced Training Sys., Inc. v. Caswell Equip. Co.*, 352 N.W.2d 1, 9 (Minn.1984) (discussing statements that are defamatory as matter of law). National Beverage argues that the challenged statements merely set out an understanding of the distribution rights for Mr. Pure products.

Twin City contends that National Beverage incorrectly applied the personal defamation standard of harm. Instead, for a corporate plaintiff, the measure for harm for purposes of defamation is whether the alleged defamatory statements "directly tend to affect the credit, property, or business of the corporate plaintiff." *Id.* at 10. Here, there was evidence that the defamatory statements affected Twin City's business. Store owner Mateer said the statements confused him and made him understand that DTM rather than Twin City had the right to distribute Mr. Pure. Store owner Stoffel indicated in his affidavit that he discontinued dealing in Mr. Pure products altogether due to the confusion as to how to obtain the product.

National Beverage also contends that by this time, Twin City was out of the beverage-distribution business and suffered no demonstrable loss. As discussed above, this was a jury question as to whether Service rescinded its purchase of Twin City's assets.

### D. Whether a qualified privilege applied

Next, National Beverage contends that the statements regarding the status of the distribution relationship between National Beverage and other entities, like statements relating to the termination of an employment relationship, enjoy a qualified privilege. *See Lewis*, 389 N.W.2d at 890. It contends that speech is protected under Minnesota law by a qualified privilege for statements "made upon a proper occasion, from a proper motive, and ... based upon reasonable or probable cause." *Stuempges*, 297 N.W.2d at 256–57. To defeat the privilege, plaintiffs must show that the defendant did not have reasonable and proper grounds for making the alleged

defamatory statement. *Id.* Here, National Beverage contends that it was protected by the qualified privilege and there was no showing of malice.

 Twin City contends that National Beverage did not introduce any evidence at trial to establish that its defamatory statements were entitled to a qualified privilege. Further, even if such evidence were present, Minnesota courts require one asserting a qualified privilege to undertake an investigation to confirm that these statements are substantially accurate. *See Wirig v. Kinney Shoe Corp.*, 461 N.W.2d 374 (Minn.1990). Here, National Beverage's representative, Perez, admitted that National Beverage did not undertake to investigate its relationship with Twin City before making the defamatory statements.

 The issue of whether a communication is privileged is a question of law, while "the question of whether the privilege was abused is a jury question." *Lewis,* 389 N.W.2d at 890. There is no showing that the district court erred as a matter of law. The jury was not asked to answer the question of whether any privilege was abused, and there is no showing that this was error.

### IV.

 The final issue we address is raised by Twin City, who argues that the district court erred when it denied its motion for attorney fees under the franchise act, Minn.Stat. § 80C.17, subd. 3 (2006). Generally, "attorney fees are not recoverable in litigation unless there is a specific contract permitting or a statute authorizing such recovery." *Barr/Nelson, Inc. v. Tonto's,* 336 N.W.2d 46, 53 (Minn.1983). "Statutory construction is ... a question of law subject to de novo review." *Anderson–Johanningmeier v. Mid–Minn. Women's Ctr., Inc.,* 637 N.W.2d 270, 273

(Minn.2002). "The object of all interpretation and construction of laws is to ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (2006); *State ex rel. Graham v. Klumpp,* 536 N.W.2d 613, 615 (Minn.1995). Words and phrases are construed according to their common and approved usage and the rules of grammar. Minn.Stat. § 645.08 (2006). An award of attorney fees under the franchise act is subject to an abuse-of-discretion standard of review. *Hughes v. Sinclair Mktg., Inc.,* 389 N.W.2d 194, 200 (Minn.1986) (holding district court did not abuse its discretion in denying request for multiplier in award of attorney fees under franchise act).

A person who violates any provision of the franchise act is liable to the franchisee, "who may sue for damages caused thereby, for rescission, or other relief as the court may deem appropriate." Minn.Stat. § 80C.17, subd. 1 (2006). Attorney fees may be awarded under the statute as follows: "Any suit authorized under this section may be brought to recover the actual damages sustained by the plaintiff together with costs and disbursements plus reasonable attorney's fees." *Id.,* subd. 3.

The jury found that Twin City had a franchise with National Beverage and that National Beverage terminated or canceled it without good cause, but it awarded no damages. The district court denied Twin City's motion for attorney fees essentially because Twin City had not obtained any relief under the act. Twin City first argues that the district court erred as a matter of law under the plain language of the statute in not awarding attorney fees.

There are only a few appellate cases in which attorney fees under the franchise act are addressed, and none of them resolve the issue raised here. In *Hughes,* 389 N.W.2d at 200, the issue concerned

whether the district court abused its discretion in denying a request for a multiplier in the calculation of attorney fees. In *Noble v. C.E.D.O., Inc.,* 374 N.W.2d 734 (Minn.App.1985), *review denied* (Minn. Nov. 18, 1985), the jury found a violation of the franchise act but awarded no damages, although it awarded damages based on a separate fraud claim. *Id.* at 740. This court ruled that the claim for attorney fees was barred by the statute of limitations and did not address whether attorney fees were authorized under the statute where the party seeking the fees had not obtained relief under the act. *Id.* at 742. Similarly, an unpublished case cited by the parties is not helpful.

To help resolve this issue, we review caselaw addressing the issue of attorney fees under other remedial statutes. As Twin City points out, the franchise act does not explicitly require a party to be a prevailing party in order to obtain fees, as some statutory provisions for attorney fees do. *Cf.* Minn.Stat. § 325E.37, subd. 5(b) (2006) (sales representative termination act, allowing reasonable attorney fees and costs to "prevailing sales representative" or "prevailing manufacturer").

Other statutes have language similar, but not identical, to that in the franchise act. The Minnesota Agricultural Equipment Dealership Act provides for attorney fees as follows:

> If a farm equipment manufacturer violates [the act] a farm equipment dealer may bring an action against the manufacturer ... for damages sustained by the dealer as a consequence of the manufacturer's violation, together with the actual cost of the action, including reasonable attorney's fees....

Minn.Stat. § 325E.065 (2006). This court held that where the plaintiff obtained injunctive relief after a violation of the act, the district court properly awarded attorney fees. *Wadena Implement Co. v. Deere Co.,* 480 N.W.2d 383, 389 (Minn.App. 1992), *review denied* (Minn. Mar. 26, 1992).

■■ In another case, this court addressed the denial of a motion for costs and attorney fees in the context of a consumer-fraud law concerning odometers. *Bachovchin v. Stingley,* 504 N.W.2d 288, 290 (Minn.App.1993). There, Minn.Stat. § 325E.16 (1992) provided that any person injured by a violation of the act "shall recover the actual damages sustained together with costs and disbursements, including a reasonable attorney's fee." *Bachovchin,* 504 N.W.2d at 290. This court closely analyzed the statutory language, stating, in relevant part, that the phrase "together with" suggested that an award of damages was a prerequisite to any award of costs, disbursements, and attorney fees. *Id.* Similarly, in this case, the franchise statute, Minn.Stat. § 80C.17, subd. 3, provides that an action "may be brought to recover the actual damages sustained by the plaintiff *together with costs and disbursements plus reasonable attorney's fees.*" (Emphasis added.) "Plus" is defined as: "Added to; along with." *The American Heritage Dictionary* 1394 (3d ed.1992). While Twin City tries to distinguish *Bachovchin* on the ground that it addressed a statute referring to a "prevailing party," that was a separate discussion of a different statute. 504 N.W.2d at 290. The franchise statute is not a "strict liability" statute. Consequently, where, as here, the sole relief sought under the franchise act was damages, the party seeking attorney fees must have sustained "actual damages" under the statute to qualify for attorney fees as a matter of law.

■■ Twin City further contends that it was awarded damages for a violation of the franchise act, under which it is entitled to attorney fees. In this argument, Twin

City refers to the jury finding that National Beverage breached the 1972 franchise agreement and the award of damages for that breach. It reasons that Twin City established that the 1972 contract was a franchise agreement and that breach of the franchise agreement was a violation of the franchise act. It asserts that because the jury found that National Beverage breached a franchise agreement in violation of the act, it is entitled to the remedies under section 80C.17, subdivision 3, including the award of reasonable attorney fees. We reject this argument because the jury's finding of the breach of the 1972 franchise agreement does not implicate the franchise act; the jury simply found the breach of a contract in the form of the franchise agreement. The district court did not err as a matter of law when it denied Twin City's request for attorney fees.

### DECISION

The district court's rulings were correct as a matter of law and we will not set aside the verdict because the jury was presented with competent evidence reasonably sustaining the findings.

**Affirmed.**